MARTIN ROTHSCHILD, Respondent, *v.* MANUFACTURERS TRUST COMPANY, Appellant.

356

Argued November 22, 1938; decided January 10, 1939.

The following question was certified:

" Does the complaint herein state facts sufficient to constitute a cause of action?"

*Leonard G. Bisco, William J. Granger* and *George B. Balamut* for appellant. The agreement is void as being against the public policy of the State. (*Matter of Morse [Bank of America],* 247 N. Y. 290; *Gause v. Commonwealth Trust Co.,* 196 N. Y. 134; *Dyer v. Broadway Central Bank,* 252 N. Y. 430; *Mt. Vernon Trust Co. v. Bergoff,* 272 N. Y. 192; *Knass v. Madison & Kedzie State Bank,* 354 Ill. 553; *Westchester Trust Co. v. Harrison,* 249 App. Div. 828; *Bay Parkway Nat. Bank v. Shalom,* 270 N. Y. 192; *Brown v. Union Banking Co.,* 274 Mich. 499; *German Baptist Orphans' Home v. Union Banking Co.,* 13 Fed. Supp. 814; *Manufacturers Trust Co. v. Grossman,* 247 App. Div. 199; 272 N. Y. 471; *Awotin v. Atlas Exchange Bank,* 295 U. S. 209; *Hawkins Realty Co. v. Hawkins State Bank,* 205 Wis. 406; *Farmers & Mechanics' Sav. Bank v. Crookston State Bank,* 169 Minn. 249.) Section 185, subdivision 9, of the Banking Law (Cons.

Laws, ch. 2), in force at the time the agreement was made, did not empower trust companies to make repurchase agreements. (*O'Connor* v. *Bankers Trust Co.*, 159 Misc. Rep. 920; 253 App. Div. 714; 278 N. Y. 649; *Gause* v. *Commonwealth Trust Co.*, 196 N. Y. 134; *Block* v. *Pennsylvania Exchange Bank*, 253 N. Y. 227; *Sistare* v. *Best*, 88 N. Y. 527; *Knass* v. *Kedzie & Madison State Bank*, 354 Ill. 554; *Kimen* v. *Atlas Exchange Nat. Bank*, 92 Fed. Rep. [2d] 615; *Bay Parkway Nat. Bank* v. *Shalom*, 270 N. Y. 172; *Mount Vernon Trust Co.* v. *Bergoff*, 272 N. Y. 192; *Scherer* v. *East Side Nat. Bank*, 263 N. Y. 190; *County Trust Co.* v. *Mara*, 242 App. Div. 206; 266 N. Y. 540; *Manufacturers Trust Co.* v. *Grossman*, 247 App. Div. 199; 272 N. Y. 471; *Tarrytown Nat. Bank & Trust Co.* v. *McMahon*, 250 App. Div. 739; *Lawrence-Cedarhurst Bank* v. *Ruth*, 162 Misc. Rep. 82.)

*James Marshall* and *R. J. Schosberg* for respondent. The agreement was not *ultra vires* but was sanctioned by section 185, subdivision 9, of the Banking Law, and was not against public policy. (*Kelly* v. *Middlesex Title Guarantee & Trust Co.*, 115 N. J. Eq. 369; *McCauley* v. *Ridgewood Trust Co.*, 81 N. J. L. 186; *McFerson* v. *Kepner*, 76 Col. 523; *Matter of Adair Realty & Trust Co.*, 35 Fed. Rep. [2d] 531; *Hawkeye S. F. Ins. Co.* v. *Central Trust Co.*, 210 Iowa, 284; *Enid Bank & Trust Co.* v. *Yandell*, 176 Okla. 550; *Osterling* v. *Commonwealth Trust Co.*, 320 Penn. St. 67; *Matter of Roberts*, 316 Penn. St. 545; *State Bank of Commerce* v. *Stone*, 261 N. Y. 175; *Block* v. *Pennsylvania Exchange Bank*, 253 N. Y. 227; *Dyer* v. *Broadway Central Bank*, 252 N. Y. 430; *Talman* v. *Rochester City Bank*, 18 Barb. 123; *Bank of Genesee* v. *Patchin Bank*, 13 N. Y. 309; *O'Connor* v. *Bankers Trust Co.*, 159 Misc. Rep. 920; *Wooster* v. *Sage*, 67 N. Y. 67; *Fitzpatrick* v. *Woodruff*, 96 N. Y. 561; *Emerson* v. *Associated Gas & Electric Co.*, 148 Misc. Rep. 636.) The court is bound by the public policy expressed in the

legislative enactments in force at the time the agreement in suit was made and which continued in force subsequent to the institution of the action. (*S. & C. A. Commercial Co.* v. *Panama R. R. Co.*, 237 N. Y. 287; *Straus & Co.* v. *Canadian Pacific Ry. Co.*, 254 N. Y. 407; *Mertz* v. *Mertz*, 271 N. Y. 466.)

FINCH, J. This action was instituted by the plaintiff in 1934 to recover the sum of $42,865, with interest, as alleged damages for the failure of the defendant bank to repurchase from him at their full purchase price various stocks and bonds bought by him from the bank during the years between 1924 and 1929. The cause of action is based upon an alleged oral repurchase agreement stated to have been made by the plaintiff with the bank in the year 1924. The complaint asserts that the defendant sought to induce the plaintiff to purchase various securities which the bank then owned or might thereafter acquire by promising to repurchase the securities thus purchased by the plaintiff, upon his demand at any time during the lifetime of said securities, at the price paid therefor by the plaintiff. The bill of particulars states that the agreement was made orally with a vice-president of the bank who has since severed his connection with the bank. During the five-year period between 1924 and 1929 the plaintiff purchased about $65,000 worth of " unlisted " or " over the counter " securities from the bank. In 1929 plaintiff called upon defendant to repurchase certain of these stocks pursuant to the agreement. Defendant did so, and shortly thereafter sold plaintiff four additional stocks. In the year 1930 the plaintiff again called upon the defendant to repurchase the securities involved herein. The defendant refused, denying the existence of a repurchase agreement or the authority of any one to make such an agreement. In 1934 the plaintiff tendered the securities to the defendant and instituted this action.

The defendant, after putting in its answer and obtaining a bill of particulars, made a motion for judgment on the pleadings on the ground that the repurchase agreement is unenforcible because contrary to public policy. Special Term denied this motion and the Appellate Division affirmed the denial, one justice dissenting. The Appellate Division certified that in its opinion a question of law is involved which ought to be reviewed by this court, as follows: " Does the complaint herein state facts sufficient to constitute a cause of action?"

A banking-corporation occupies a different relation to the public than do ordinary corporations, and its transactions frequently are subjected to a closer scrutiny and tested by a higher standard than that applied to ordinary commercial affairs. (See *Gause* v. *Commonwealth Trust Co.*, 196 N. Y. 134, 153.) " Banking is a business affected with a public interest. (*Noble State Bank* v. *Haskell*, 219 U. S. 104.) Its nature makes it peculiarly an object of legislative solicitude in order that depositors and stockholders may be protected and proper management by those responsible therefor secured according to legislative theories of public welfare." (*Matter of Morse*, 247 N. Y. 290, 303.) An agreement, valid and enforcible if made by an ordinary corporation or business, may, by reason of public policy, be void and unenforcible against a banking institution. Thus, where a bank brings suit on a promissory note, the defendant may not plead lack of consideration and an agreement not to enforce the instrument, since the defendant knows or was chargeable with knowledge that the note might be used to conceal the actual transaction. (*Bay Parkway Nat. Bank* v. *Shalom*, 270 N. Y. 172; *Mount Vernon Trust Co.* v. *Bergoff*, 272 N. Y. 192.) The public policy behind these rulings is that the stability of banks is a matter of such public concern that the State should not sanction any device intended to give a false appearance to a transaction or increase the apparent stability as contrasted

with the true condition of a bank. It may be noted here that this rule of public policy in no wise depends upon the solvency or insolvency of the bank. (*Mount Vernon Trust Co.* v. *Bergoff, supra; Manufacturers Trust Co.* v. *Grossman,* 247 App. Div. 199; affd., 272 N. Y. 471.)

The agreement in the case at bar violates this public policy. The sale of the securities, apparently valid and complete, increased the liquid assets of the bank. Seemingly the bank had disposed of the securities and had received in return cash or valuable commercial paper. Yet if the agreement of repurchase were upheld, the bank, at the same time that it apparently made an absolute sale and improved its financial stability, would have burdened itself with a contingent liability in the same amount as the sales price. The contingent liability is of such nature that it cannot be measured in advance and can be determined day by day only by checking on the market value of the securities sold subject to the repurchase agreement. Neither the depositors nor public officials could determine with certainty the stability of a bank which had made a number of such agreements. These agreements are not enforced ordinarily during periods of normal business and financial conditions. It is not until there is a financial depression, and market prices go down, that repurchase agreements will be enforced. They impose a loss upon the bank and deplete its assets at a time when it is most in need of such assets to meet the demands of ordinary banking business. Such contracts are " forms of contingent liability inimical to sound banking and perilous to the interest of depositors and the public." (*Awotin* v. *Atlas Exchange Nat. Bank,* 295 U. S. 209, 211.)

It is asserted that, while all this may be true, the situation created by the repurchase agreements is no different from that resulting from the sale of bills or notes with the bank's guaranty by indorsement. Differences between the effect of the repurchase agreement and the liability

of an indorser of a bill or note, however, are substantial. In the one case the loss suffered by the bank depends entirely upon market conditions and the determination of the purchaser to enforce the agreement. In the other, liability does not arise until there is default on the part of the maker, and such default, while it may be influenced by, is not dependent upon market conditions, but upon the financial stability of the maker of the bill or note, which the bank had an opportunity to judge before it sold the commercial paper with its indorsement. In addition to this great difference between the effect of the two agreements there is another reason why the analogy, between a repurchase of securities agreement and the indorsement of commercial paper is far from being a valid one. In the business world it is taken for granted that negotiable instruments will be indorsed when they are negotiated. This is true whether the negotiation is by a bank or by a private individual or corporation. Agreements to repurchase securities at the purchase price on the other hand, are far from being a common practice. They are the exception rather than the rule. An excerpt from a Minnesota case, quoted by Judge (now Chief Judge) CRANE, in *State Bank of Commerce* v. *Stone* (261 N. Y. 175, 181), while involving a somewhat different question, is particularly apt: " The former is clearly necessary, usual and incidental, whereas the latter is neither necessary, usual or incidental, but is positively dangerous." (*Farmers & Merchants State Bank* v. *Consolidated School District*, 174 Minn. 286, 292.)

What has been said in answer to the argument that repurchase agreements are no more violative of public policy than the indorsement of commercial paper applies with equal if not greater force to the attempted analogy between repurchase agreements and the sale of real estate by deed of general warranty.

Finally, we consider section 185 (subd. 9) of the Banking Laws (Cons. Laws, ch. 2) (since repealed, L. 1937, ch. 619

[3]), upon which the respondent places so much reliance. From the fact that this section granted the power to banks " to purchase, invest in and sell stocks, bills of exchange, bonds and mortgages and other securities," it does not follow that repurchase agreements may be made or that such agreements accord with public policy. The grant of the power to buy and sell carries with it the appropriate powers which are incidental and reasonably requisite for the effective exercise of such power. It has already been pointed out that the power to agree to repurchase is not incidental to the power to purchase and sell; nor does the lack of such power substantially destroy the power to buy and sell. As noted, sales of securities subject to repurchase agreements are the exception rather than the rule. The fact, as stated by one of the text authorities relied upon by the respondent, that such a practice " is not unknown " among bond houses, obviously does not lead to the conclusion that the power to buy and sell necessarily carries with it. the power to agree to repurchase. (Westerfield on Banking Principles and Practice, p. 166.)

The undesirability of the existence of such a power from the public point of view is brought out in clear contrast by the facts in the case at bar. Here we have an oral agreement entered into in 1924 by a vice-president, no longer with the bank — an agreement which never appeared on the books of the bank and which an officer of the bank had deliberately refused to place thereon, " as it would then appear as a contingent liability of the bank." In 1930, six years after the oral agreement was made, the demand to repurchase is made. During all this time the public and public officials who examined the books and financial statements of the bank were unaware of the existence of this contingent liability. It was not until a serious business and financial depression had brought about a great decline in security prices that the demand to repurchase was made and the existence of

the agreement made public. Ordinarily it will not be, until a time when a bank is having difficulty meeting its regular obligations that this additional burden will be saddled upon it. Such agreements imperil the stability of a bank and the security of its depositors. They are against public policy, and nothing contained in the Banking Law brings them within public policy. Respondent urges in this court the view taken by the learned court at Special Term that the bank's loss is attributable to its original investment rather than the buy-back agreement. Such contention, even if true, is beside the point, since the vice of the transaction lies in giving a misleading appearance to the financial condition of the bank which deludes banking examiners, depositors and stockholders.

Cases in other jurisdictions are in conflict on this subject, and those cited are for the most part distinguishable. While a uniform view in other States carries weight where a question is doubtful, the public policy here is clear, and there is no reason for hesitance merely because a few jurisdictions have reached a contrary result.

The orders should be reversed, with costs in all courts, and the motion granted, with costs, and ten dollars costs of motion. The certified question is answered in the negative.

LEHMAN, O'BRIEN, HUBBS, LOUGHRAN and RIPPEY, JJ., concur; CRANE, Ch. J., taking no part.

Orders reversed, etc.