OPINION OF THE COURT
William D. Friedmann, J.
This “Small Claim’s” action seeks “Return of money, for lack of security, resulting in loss of money ($502.02)”. Tried on February 17, 1982, it presents an issue of apparent first impression involving no reported New York authorities and out-of-State decisions directly on point.
What duty, if any, does a bank owe a “business invitee”, who after cashing her check, was the victim of a robbery by a third party while still inside the bank premises?
At the conclusion of claimant’s case and again at the end of defendant’s case, defendant bank moved to dismiss (a) for failure to state a cause of action, and (b) that claimant failed to sustain her burden of proof on the issue of defendant’s gross negligence. Decision was reserved.
Upon an examination of the trial transcript and all the papers submitted by both sides in connection with defendant’s motion to dismiss, this court finds the pertinent facts and circumstances surrounding the robbery of claimant to be as follows:
*78 PERTINENT AND UNDISPUTED FACTS
OF THE ROBBERY
On Thursday, September 24,1981, at or about 1:00 p.m., claimant, employed by Gulf & Western Industries, Inc., went to defendant’s branch banking premises located in the basement of the Gulf & Western building right off an entrance to a subway. Claimant did not maintain an account with defendant, but, as was the custom of many Gulf & Western employees, she went to this branch to cash her payroll check. Claimant then cashed her payroll check ($502.02), drawn on defendant by Gulf & Western, her employer, and stepped away from the teller’s station. She then went to a table, provided by the bank for validation of money or for the use of customers in the handling of other banking transactions, to count her money, when a man came from behind claimant and quickly snatched away her money. Claimant let out a scream, saying “I was robbed.”
DISPUTED. FACTS AFTER
THE ROBBERY
The facts as to what happened after the robbery and the assistance or lack thereof given claimant by the bank are in dispute. Claimant maintains that she immediately reported the robbery to a bank employee whose immediate response was: “We’re not responsible.” As nothing was done about the incident by the bank, claimant went back to her office located in the same building and told her employer about the occurrence in the bank and the loss of her money. The employer called the bank and the security director of Gulf & Western, who then called the police and reported the crime.
Defendant’s witness, a bank teller, testified that he had heard a noise in the branch and that he investigated a “commotion”, and was told by somebody that a woman had been robbed in the bank. He identified claimant as the person who was the victim of the robbery and at trial stated that after the event in question he saw some money still in claimant’s hands and offered to count it for her. Claimant resisted saying she feared the perpetrator would return and kill her..
*79 CONTENTIONS CONCERNING
SECURITY PRECAUTIONS
A. CLAIMANT
Claimant, in laymen’s words, alleged that a proximate contributing cause of her loss was the bank’s lack of security, or inadequacy of security, and that the bank ought reasonably to have anticipated the possibility or probability of harm to its business invitees, including claimant, and guarded against it. In support of her contention that the bank owes a person such as herself an unspecified duty of protection, claimant maintained that the bank branch did not have a security guard at the time of the occurrence and that the bank-installed glass bandit barriers separating the tellers from the rest of the bank premises (and other security or anticrime equipment) are for the primary protection of the bank employees not the customers.
! Claimant in further support of her contention that the bank in the exercise of reasonable care could have foreseen or anticipated the robbery which victimized her and could have guarded against it, makes the following points:
(1) The bank branch had been robbed on prior occasions;
(2) The bank was in a superior position to know about bank robberies in general and about any specific aborted or unsuccessful robbery attempts at the bank branch;
(3) The bank branch was in a vulnerable location being in the basement of a building providing easy, access to the bank from the subway;
(4) The bank knew or should have known that Thursday, the day of claimant’s robbery, was a Gulf & Western payday when unusually heavy cashing of checks by Gulf & Western employees occurred.
The bank conceded that its branch at the Gulf & Western building was successfully robbed on October 12, 1978 and that an unsuccessful attempt was made at the night window outside the bank on July 25, 1980 when perpetrators were apprehended and arrested. The bank also conceded that this branch office was (and still is) “used almost exclusively by Gulf & Western employees”.
*80 B. THE BANK
The bank takes the following positions as to the duty, if any, it owes a business invitee such as claimant:
(1) In order to recover, claimant has the burden of showing defendant grossly negligent;
(2) The bank is a store like any other store and owes its customers no special duty or care;
(3) The bank does not insure the safety of its customers. In this regard, it was stated, “We are required to keep the premises in a reasonably safe condition for the use of customers who enter for the purpose of banking transactions and do continuously renew protection and security.”
(4) A customer is on his or her own while inside the bank before getting to the teller’s station or leaving the teller’s station. “The check was cashed and plaintiff stepped away from the teller’s station. From that point forward, the cash was under the sole care, custody, control, management and possession of Plaintiff”.
(5) The security at the bank branch is reasonably adeL quote and therefore defendant met its duty to provide reasonable care. That plaintiff’s loss was not foreseeable and therefore it is not liable for plaintiff’s loss.
The bank in support of its contention that it had taken adequate security precautions at its branch presented the testimony of its senior investigator in charge of Manhattan branches. He testified that the branch in question has standard barriers, cameras, alarms and concave mirrors from which tellers can observe anyone entering through the door into the bank. Concerning security guards, he testified:
“No. We have -guards only in specific branches that would not have standard barriers.
“It’s discovered, through experience, that the Police Department came up with figures that guards are basically ineffective in the greater majority of the time when there is a holdup. They have been at lunch.
“However, if they are present they are unable to stop it.
“The guards we have have orders that if there is a holdup they are not to get involved in order to safeguard the customer and employees.”
*81 Defendant further contended that its plainclothes investigators visit its branch offices from time to time to discuss protection and security with branch management and insure that they are in compliance with regulation P of the Federal Reserve Board: “Minimum Security Devices and Procedures for Federal Reserve Banks and State Member Banks.” (12 CFR Part 216.)
THE LAW
This court believes that the general public assumes that when one is present in a bank premises to transact business that he or she is present in a safe and secure place; that the public reaches this conclusion of confidence by reason of the very special character and purpose of a bank, namely, that it receives, keeps and distributes money, money being a most convertible commodity. This special characteristic in public perception makes a bank quite different from any other store or commercial premises. The public would become quite uneasy or rudely shocked and thereby more “under the mattress” oriented if it were told, as the bank here contends, that they (whether as business invitees or visitors of some lesser status) are on their own in their trips to and from the bank door to the teller’s station, and on their own while they are engaged in banking activity at the convenience counters or while they are present in and around other parts of the bank’s interior.
This court agrees with the attorneys for the bank that there are, apparently, no New York cases, or cases in other jurisdictions, directly on the issue of a bank’s duty to make its premises safe for the public. And the two out-of-State authorities relied upon by the bank, namely, Altepeter v Virgil State Bank (345 111 App 585) and Burgess v Chicopee Sav. Bank (336 Mass 331) involve physical injuries to bank invitees suffered during the course and furtherance of robberies of those banks and consequently are of limited persuasive value here.
One of claimant’s theories advanced at the trial and repeated in her informal “reply” to defendant’s “Statement of Facts and Memorandum of Law” was that the history of criminal activities in and around the Gulf & Western building gave rise to an obligation on the part of the bank *82 lessee of the premises to take reasonable steps to minimize the foreseeable dangers to those unwary individuals who might enter the premises of the bank.
What affirmative protective acts must a bank take to make its premises reasonably safe for the enjoyment of the banking public?
At the outset, it should be stated that an owner or lessee is not an insurer of the safety of those who come upon the property (Akins v Glens Falls City School Dist., 53 NY2d 325, 329; Restatement, Torts 2d, § 344). It would seem unreasonable to hold banks accountable for all the intentionally harmful acts of third persons. It would seem equally unreasonable to adopt one of the bank’s contentions herein that a bank’s obligation to provide a safe and secure premises is satisfied by the exercise of a standard of protection which requires only slight care, that being the corresponding measure of care required to avoid liability for gross negligence.
In passing, it is appropriate to point to the standard of care which a bank is required to exercise with respect to the handling of customer money and other typical banking transactions (see Rothschild v Manufacturers Trust Co., 279 NY 355; Gause v Commonwealth Trust Co. of N. Y., 196 NY 134; Matter of Morse [Bank of Amer.], 247 NY 290); The New York Court of Appeals has long established the following rule of thumb with regard to banks: “A banking corporation occupies a different relation to the public than do ordinary corporations, and its transactions frequently are subjected to a closer scrutiny and tested by a higher standard than that applied to ordinary commercial affairs.” (Rothschild v Manufacturers Trust Co., supra, p 359; Gause v Commonwealth Trust Co., supra, p 153.) Because banking is a business affected with a public trust (Noble State Bank v Haskell, 219 US 104), “[i]ts nature makes it peculiarly an object of legislative solicitude in order that depositors and stockholders may be protected * * * according to legislative theories of the public welfare” (Matter of Morse [Bank of Amer.], supra, at p 303).
But what is the bank’s duty owed a bank customer “injured” on the premises?
*83 The first inquiry regarding “status” is easy, as the bank concedes that common-law classifications of status are no longer determinative in assessing the duty of care owed by the bank to its customers. It is now well established that the duty owed is one of “reasonable care under the circumstances whereby foreseeability shall be a measure of liability” (Basso v Miller, 40 NY2d 233, 241). The injured party’s status remains relevant, however, in assessing the foreseeability of his or her presence on the premises and the probability that that person might suffer injury.
The next and more difficult task is an examination of the facts to ascertain “whether the foreseeability of the presence of an entrant on [the premises] is too remote, given the nature of the [attendant] risk and the burdens that would be imposed on [the bank] to [adequately] guard against it.” (Quinlan v Cecchini, 41 NY2d 686, 689.)
Applying these principles to the facts at bar, with a view toward seeing that “substantial justice” is done (CCA, § 1804), this court holds that where, as here, the bank either knows or has reason to know from past experience that there is a likelihood of conduct on the part of third persons which is likely to endanger the safety of a bank visitor, the bank is obliged to take all necessary protective measures and to provide a reasonably sufficient number of servants to afford reasonable protection. Given the very nature of a bank and the business it does and considering the many recent media-documented robbery attempts and completions, it seems reasonable to conclude that banking invites certain very real risks to the public at large. Whether the crime be one of random violence or a deliberate, planned attack, bank robberies seem to be a fact of everyday life, committed by persons of all ages and by amateurs and professionals alike. (See, e.g., People v Delgado, 110 Misc 2d 492.) Furthermore, this court takes judicial notice that such criminal incidents have lately become so serious that a joint Federal-New York City Bank Robbery Task Force was organized sometime in 1978 to combat this crime epidemic. (Crime statistics kept by the New York City Police Department reveal that in 1979 there were 860 bank robberies; in 1980, 748 and in the first 11 months of 1981, 643.)
*84 Before closing, this court deems it necessary to make a few remarks about the proper standard of care for a bank to employ in providing safety and security for bank users. Although no precise line can be drawn, the standard would seem to lie somewhere mid-line between “slight” and “absolute”, that is, banks are required to exercise reasonable care and take reasonable precautions to protect all categories of persons who come upon their premises. What is reasonable, of course, depends on various circumstances and factors, such as the current specific and general crime statistics, geographic location of the bank, physical arrangements of the bank in relation to traffic and transportation, predictable customer use and the perceptive deterrent effect of bank guards and other various anticrime paraphernalia.
In determining that inadequate security precautions were a proximate contributing cause of claimant’s loss, I find that under the circumstances presented, where the probability of harm should reasonably have been foreseen, the added precautions suggested by the claimant, namely, the physical presence of a bank security guard, would have appreciably diminished the likelihood of an occurrence such as the one that victimized claimant.
Finally, I find that the defendant bank had an obligation to report this on-premises robbery to the police department regardless of any purported acts or statements made by the claimant to the contrary.
In view and because of the above, defendant’s motion to dismiss is denied. Judgment is granted to claimant in the sum of $502.02 with interest from September 24, 1981 together with costs and disbursements.