OPINION OF THE COURT
Lorraine S. Miller, J.
Defendant Fleet Bank (Fleet) leases parts of the mezzanine, ground floor, and basement areas of 592 Fifth Avenue, at 48th Street in Manhattan. One block south is probably one of the world’s largest consumer markets for diamonds, watches and other stones. A single block, 47th Street between Fifth and Sixth Avenues, is crowded with over 2,600 gold and precious gem merchants who handle some 90% of the diamonds which come into this Nation.[1]
Plaintiff Mark Moskal (Moskal) is one of those jewelers. Moskal rented a safe-deposit box in Fleet’s vault, located in the bank’s basement, which he regularly visited to deposit or retrieve jewelry and cash. On April 18, 1996 he visited the vault twice in the morning and, at approximately 2:30 p.m., Moskal returned once again. As he approached the street-floor elevators which took customers down into the basement vault area, he found that the renovation work being done that afternoon was blocking the elevator entrance. According to Moskal, a security guard told him to take the stairway as an alternative means to gain access to the vault. He did so.
*821 Before discussing the parties’ allegations, it will be helpful to understand the physical layout of the bank’s leasehold. Unfortunately, neither the parties’ factual recitations, as supported by the exhibited depositions, nor the floor plans annexed to the bank’s lease, are clear as to the exact layout of the basement. While the elevator would take customers directly in front of the secured vault’s glass-partitioned door, the lobby stairway apparently did not. Instead, it opened into a hallway which led to the vault door.[2] Once at the door, upon presentation of identification and a deposit box key one of the attendants stationed inside would provide access. There was also a separate stairwell from the ground floor branch to directly inside the basement vault. This stairwell was not made available to anyone except Fleet personnel.
Moskal testified at his deposition that he went down the lobby stairwell and, coming out into the hall, turned right. HaliWay down the corridor he was confronted by a person who slapped him, held a knife to his neck, and robbed him of his valuables. As a result of this encounter Moskal claims serious physical and emotional injuries, as well as loss of property.
Moskal and his wife are suing Fleet Bank, UOB Realty (USA) Limited Partnership (UOB) and Axiom Real Estate (Axiom), the building owner and managing agent, respectively, Effective Security Systems, Inc. (Security), the company which provided security guards for the building, and Interior Construction Company (Interior), the contractor performing the renovation work inside the bank lobby. The plaintiffs allege that the defendants failed to protect Mr. Moskal against a forseeably dangerous condition that led to his assault and robbery. Specifically, Moskal alleges that UOB and Axiom were negligent in hiring inadequate security guards; that Fleet was negligent in supervising the security guards and failing to take proper precautions or make adequate provisions for his safe access to the vault; and that Security was negligent because it was Securitys employee who had directed Moskal to a position of danger and failed to take adequate precautions to safeguard him. Finally, Moskal alleges that Interior was negligent by blocking the elevator with its scaffolding and disrupting the elevator service to the vault area without taking any precautions to ensure Moskal’s safety in taking an alternate route.
UOB and Axiom argue that as landlord and managing agent of the premises, they cannot be held liable for Moskal’s injuries *822 because the probability of criminal conduct was not reasonably foreseeable.[3] They point to Moskal’s own deposition that he had been a patron of Fleet for approximately 20 years and had never experienced similar incidents, that he did not know of any similar incidents to other patrons, and that he had been to the bank twice the very same day and did not notice anything unusual. Thus, UOB and Axiom claim, Moskal has failed to raise an issue of fact as to whether the security measures were appropriate and whether the incident was reasonably foreseeable.
For its part, Fleet also contends that it had no legal duty to protect against an assault that could not have been reasonably anticipated and was “unusual, abnormal, sudden and unexpected”. Fleet admits that there were two occasions in which “hold up” notes were passed to tellers on the first floor of the bank but, other than these undated incidents, there had been no prior criminal activity within the subject premises, let alone the basement hallway. Fleet also argues that plaintiffs assault could not have been guarded against because Moskal’s testimony established that the incident took less than 2V2 minutes, during which time Moskal saw no one else in the hallway.
Security similarly claims that it did not create an unreasonably increased risk for Moskal. Through the deposition of A. Gus Avena, former vice-president and account executive, Security states that its contractual obligations were limited to providing, around-the-clock, one unarmed, uniformed “guard” available “to ¡report conditions of fire, theft, vandalism and trespassing.” The guard was posted in the lobby of the building and the guard had no responsibility for the vault area. Thus, Security argues, it owed no duty to Moskal because he was not a third-party beneficiary of its contract with the building. And since the contract did not extend to the vault area, there could be no detrimental reliance by Moskal.
Finally, Interior argues that, as the contractor performing renovations on the street floor, it was under no duty to protect Moskal from the criminal acts of third persons in the basement, the crime was unforeseeable, and there was no proximate cause.
*823 Moskal alleges there are questions of fact as to foreseeability of the robbery and the parties’ respective duties which preclude summary disposition. Moskal points out that the building manager, Mark Domiczek, testified that throughout April 1996 the lobby and elevators were undergoing extensive renovation, which prompted changes to the door locks of the stairwell leading to the basement, and that this door was unlocked throughout the period of construction so that workers could access the basement and put equipment on the stairway landing. The security desk was removed from its usual position in front of the door to the stairwell. There were no signs on the door warning customers not to descend the stairs because Security was relied upon to warn customers of the danger in using the staircase. However, despite the guard’s presence, Domiczek stated that customers were known to occasionally gain access to the vault area by means of the staircase.
Fleet’s vice-president, Ronald Coccaro, was deposed and confirmed that, although vault customers were supposed to use the elevators to access the vault area, the bank was aware that, on occasion, customers would use the lobby stairwell to get downstairs. Coccaro was concerned about customers using the stairwell because it was steep and narrow, and because it was meant to be used by employees only. Coccaro also stated he knew that at times during the renovation period the door was propped open, with construction materials on the landing, increasing the danger of using the stairs. And, as Security’s former vice-president, Mr. Avena testified, “When people came in to utilize the vault facilities, [the] guards instructed those people to use the elevator and not the staircase up and down.” Security had been given instructions to follow this rule by both the bank and “the building people”. Thus, in addition to their customary, general responsibilities, the security guards were under a specific affirmative duty to warn customers not to use the stairwell.
Accordingly, Moskal contends that by wholly disregarding and violating the known policy, defendants thereby created a risk of danger and that the robbery could have been prevented if Security had directed him to take the elevator. Since Security had the duty to keep customers like Moskal from using the stairwell, particularly during the renovation period, Security placed Moskal in a more vulnerable position. The prevent-ability of the incident, he argues, is a strong factor in whether or not defendants’ alleged negligence was a proximate cause of his injuries. Moskal also contends that because, as Fleet’s vice- *824 president acknowledged he was- aware, jewelry dealers made up a large number of the vault customers, this rendered the bank particularly attractive to criminals and Fleet was on notice of this.
DISCUSSION
An owner or possessor of land has a common-law duty to maintain the public areas of the property in a reasonably safe condition for those who use it. (Nallan v Helmsley-Spear, Inc., 50 NY2d 507, 519-520 [1980].) This duty includes the obligation to maintain minimal security precautions to protect users of the premises against injury caused by the reasonably foreseeable criminal acts of third persons. (See, Miller v State of New York, 62 NY2d 506 [1984].) However, the owner or possessor is not an insurer of safety of those who use the premises and it cannot, even when there is a history of crime committed on the premises, be held to a duty to take protective measures unless it is shown that it knows or, from past experience, has reason to know, that there is a likelihood of third-party conduct likely to endanger the safety of those using the premises. (Nallan v Helmsley-Spear, Inc., supra.) It is knowledge, actual or constructive, that creates the duty to take reasonable precautions for the safety of those lawfully using the premises.
On its face, one would assume that, of all places, banks certainly have a heightened need to provide security since, as Willy Sutton said, “That’s where the money is.” However, as several cases on bank liability explain, such an institution only has “a duty to take reasonable precautions to secure its premises if it knew or had reason to know from past experience ‘ “that there is a likelihood of conduct on the part of third persons * * * which is likely to endanger the safety” ’ of users” (Dyer v Norstar Bank, 186 AD2d 1083 [4th Dept 1992] [emphasis added], lv denied 81 NY2d 703 [1993], quoting Nallan v Helmsley-Spear, Inc., supra, at 519). Thus, the layman’s intuitive understanding that a bank is, by definition, a “safe” place has been restricted by the narrower rule of landowner liability.
For example, in Vaughan v Bank of N. Y. (230 AD2d 731 [2d Dept 1996]), the Second Department found that where there was only one instance of a prior robbery at the bank’s night depository in the two-year period before the incident, the risk of robbery at that night depository was not foreseeable. Thus, the Court held that the bank could not be held liable to its customer, who was assaulted and robbed while making a de *825 posit. The same result was reached in Golombek v Marine Midland Bank (193 AD2d 1113 [4th Dept 1993]). There, in discounting plaintiffs evidence of two reported crimes prior to the incident in question, a robbery at the night depository 22 months earlier and a robbery at the bank 10 months earlier, the Court stated that the two incidents did not give rise to a duty on the bank’s part to anticipate a risk of harm from criminal activity at the night depository box. (See also, Cercone v Norstar Bank, 199 AD2d 987 [4th Dept 1993] [bank not liable for fatal assault at night deposit box].)
A similar line of cases, involving robberies at automated teller machines (ATMs) during off-hours, hold that the failure to demonstrate a significant number of recent crimes in the immediate vicinity of the ATM precluded a finding that the assault at issue was foreseeable. The leading, and most recent, decision in this area is Williams v Citibank (247 AD2d 49 [1st Dept 1998]). Writing for a unanimous bench, Justice Sullivan analogized to the night depository cases and found that the mere assertion, or, “[e]ven evidence of prior criminal activity in the general neighborhood will not satisfy a plaintiffs burden * * * Nor does plaintiffs unsupported assertion, that 'ATMs attract criminal activity’, satisfy his obligation to show that Citibank was on notice of previous criminal activity at this particular facility. This statement has no probative value.” (Supra, at 52 [citations omitted].) In addition, Justice Sullivan took care to rehearse the several ways in which Citibank had provided “certain minimal security measures”: ingress only by use of an ATM card; fire bolts; one exterior wall of untinted glass; three surveillance cameras; and a working telephone. (Supra, at 53.)
However, unlike the night depository or ATM cases, the assault on Moskal was inside the building, and in an area of the bank which, by its very nature, was intended to be more private and secure. True, there is scant proof of prior criminal activities, and none of any incident similar to Moskal’s. However, as discussed, there was notice of a hazard to using the stairwell; in fact, it was so well known that the bank instructed the owner to have Security prohibit the use of the stairs. The Fleet vice-president expressed concern that customers had used the stairs when he knew it to be dangerous to do so. As admitted by him, Fleet had an established policy of prohibiting customers from using the stairs even prior to the construction because of the physical danger the stairs posed. The dangerousness of the stairwell was recognized as even *826 greater during the construction period, such that a security officer was specifically instructed to direct people away from the stairs to the elevator. The vault area itself was frequented by diamond district jewelers, it was a special “secure” area where entrants had to present verification of their account and their deposit box key, and there was always at least one attendant present.[4] In this regard, Moskal’s situation is more akin to cases assessing a landowner’s duty to provide security for the benefit of tenants and invitees. (Burgos v Aqueduct Realty Corp., 92 NY2d 544 [1998]; Garrett v Twin Parks Northeast Site 2 Houses, 256 AD2d 224 [1st Dept 1998] [Saxe, J., concurring].)
The nature of the harm that befell Moskal is ultimately immaterial. Harm of some sort was foreseeable, which Fleet recognized. It created a specific policy so as to keep people away from the lobby stairwell. However, the bank failed to ensure that .its policy was carried out or, as is usual in most banks, to permit entrance to the vault by means of its own stairwell. Indeed, as Moskal suggests, it may have been the accessibility of the lobby door to the basement that permitted the mugger to gain entry to that area. While defendants counter that it is just as possible that the attacker accessed the basement from another floor in the building, taking the elevator down to the basement, certainly, had Moskal been permitted the use of the bank’s internal stairwell directly into the vault, this could not have occurred.
Thus, given these unique circumstances, the court finds that Moskal has plainly raised questions for the jury as to whether the bank permitted its own clear policy to be disregarded, or failed to provide another, secure means of entry to the vault. (See, Garrett v Twin Parks Northeast Site 2 Houses, supra, 256 AD2d, at 226 [1st Dept 1998] [“whether particular precautions are adequate to fulfill the landlord’s obligation is almost always a question of fact for the jury based upon the nature of risk presented and the availability of security measures”].) If believed by the jury, this disregard of a known condition of danger could warrant a jury finding of proximate cause, and negligence. In other words, it is not through mere speculation that a jury could determine that Fleet did have a duty to protect Moskal from the assault and robbery.
*827 “When faced with a motion for summary judgment on proximate cause grounds, a plaintiff need not prove proximate cause by a preponderance of the evidence, which is plaintiffs burden at trial. Instead, in order to withstand summary judgment, a plaintiff need only raise a triable issue of fact regarding whether defendant’s conduct proximately caused plaintiffs injuries.” (Cisse v S.F.J. Realty Corp., 256 AD2d 257, 258 [1st Dept 1998]; see also, Travieso v 3908 Bronx Blvd. Corp., 259 AD2d 276 [1st Dept 1999]; Tully v Sylvan Lawrence Co., 1999 WL 60148, 1999 US Dist LEXIS 1207 [SD NY, Feb. 4, 1999, Martin, J.] [explaining Burgos (supra) as having eased plaintiffs burden in proving negligent security]; Comeau v Wray, 241 AD2d 602 [3d Dept 1997] [landowners with reasonable awareness of obvious danger have duty to warn or protect]; Hoey v City of New York, 187 AD2d 386 [1st Dept 1992] [issues of fact preclude summary judgment]; Stalzer v European Am. Bank, 113 Misc 2d 77 [Civ Ct, Queens County 1982] [bank’s duty of care].)
Even if ultimately a jury does find a duty on the part of Fleet, it is difficult to fathom how UOB and Axiom shared in it. The entire basement appears to have been leased to Fleet, and Security had no responsibility for the vault or any other area of the basement. Moskal’s attack was plainly unforeseeable by the building defendants, including Security. (Nallan v Helmsley-Spear, Inc., 50 NY2d 507, supra.)
The heightened security implied by the nature of the bank’s business, coupled with its recognition of some sort of foreseeable danger in using the lobby stairwell, implicates Fleet only. In Palka v Servicemaster Mgt. Servs. Corp. (83 NY2d 579 [1994]), the Court took pains to carefully explain that customers entering a business open to the public have a reasonable expectation that the degree of security and safety therein is commensurate with the purpose of the business. In Palka it was a hospital’s duty to the public. (Supra, at 585 [“ ‘(t)he risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation’ ” (emphasis in original)], quoting Palsgraf v Long. Is. R. R. Co., 249 NY 339, 344.) Here, it is the bank’s duty to its “public” or customers.
Finally, Interior clearly had no duty to customers outside the scope of its construction activities. Blocking the elevator with scaffolding was necessary in the performance of its tasks and, assuming causation, if Fleet had made proper provisions for the safety of its vault customers, Interior’s blockage of the elevator would have been of no moment. Upon no set of facts *828 can it be said that Interior’s activities were the “ ‘substantial causative factor in the sequence of events’ ” which led to the assault upon Moskal. (Mkrtchyan v 61st Woodside Assocs., 209 AD2d 490 [2d Dept 1994].) Accordingly, it is ordered that UOB and Axiom’s motion for summary judgment is granted; and it is further ordered that Fleet’s cross motion for summary judgment is denied; and it is further ordered that Security’s motion for summary judgment is granted; and it is further ordered that Interior’s cross motion for summary judgment is granted, and the Clerk is directed to enter judgment dismissing the action as to defendants UOB, Axiom, Security, and Interior.

. For more information, visit the web site, “47th Street, New York — New York Diamond and Jewelry District”, www.47th-street.com. (See also, www.diamond-district.com.)

. The exact location and length of this hallway — which could be critical in understanding plaintiffs claim — is the single most important uncertainty.

. They also argue that, pursuant to Fleet’s lease, Fleet was required to purchase insurance to protect them against claims such as these. However, by their reply papers, UOB and Axiom have withdrawn that portion of their motion seeking “conditional summary judgment against Fleet Bank.”

. Fleet’s basement also contained a lunchroom for its employees, a storage room and mail room, a telephone closet for the building, and two bathrooms.