DEBBIE L. IRWIN & others[1] vs. TOWN OF WARE.

Hampshire. January 10, 1984. — August 15, 1984.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Evidence,* Hearsay, Business record, Blood alcohol test, Intoxication. *Massachusetts Tort Claims Act. Negligence,* Municipality. *Municipal Corporations,* Liability for tort, Officers and agents, Duty to prevent harm. *Police,* Negligence. *Motor Vehicle,* Operating under the influence.

At the trial of an action against a town under G. L. c. 258, the Massachusetts Tort Claims Act, for injuries and deaths resulting from the alleged negligent failure of the town's police officers to remove from the highway a motor vehicle operator who was under the influence of intoxicating liquor, it was error requiring reversal of judgments in favor of the plaintiffs for the judge to admit in evidence a letter sent by the chief of a medical laboratory at the University of Massachusetts Medical Center, addressed to the medical examiner in the town, and stating the alcohol content of that operator's blood and the blood of the operator of a second vehicle, with which he collided, where the letter was not a record made in the ordinary course of business within the meaning of G. L. c. 233, § 78, nor shown to contain information reported as matter of business duty or business routine, and where insufficient evidence was introduced to make the necessary link between the first operator and the blood tested as his. [748-751]
A police officer's decision whether to remove from the highway a driver who he knows or has reason to know is intoxicated is not a discretionary act for purposes of a public employer's exemption from liability under the Massachusetts Tort Claims Act, as expressed in G. L. c. 258, § 10 (*b*). [752-754]
A municipality may be held liable in damages under G. L. c. 258, the Massachusetts Tort Claims Act, for the negligent failure of its police officers to remove from the highway a motor vehicle operator who is under the influence of intoxicating liquor and who thereafter causes injury or death to a member of the public. [754-763] NOLAN, LYNCH & O'CONNOR, JJ., dissenting.

[1] Steven Irwin by his mother and next friend, Debbie L. Irwin; and Debbie L. Irwin as administratrix of the estates of Mark D. Irwin and Misty Jane Irwin. See note 13, *infra,* for a more detailed description of the claims asserted.

At the trial of an action against a town under G. L. c. 258, the Massachusetts Tort Claims Act, to recover damages for injuries and deaths in a collision resulting no more than ten minutes after the alleged negligent failure of the town's police officers to remove from the highway a motor vehicle operator who was under the influence of intoxicating liquor, there was sufficient evidence, after removing from the case certain results of blood alcohol tests which this court held to have been improperly admitted, to support findings that the town's police officers were negligent and that their negligence was the proximate cause of the harm for which recovery was sought. [763-765]

In an action against a town to recover damages for injuries and deaths resulting from the alleged negligent failure of the town's police officers to remove from the highway a motor vehicle operator who was under the influence of intoxicating liquor, G. L. c. 258, § 2, limited the town's liability to $100,000 for each plaintiff, even if the plaintiff maintained more than one claim. [766-773]

A nonexpert's testimony that another was intoxicated is admissible in evidence. [774]

CIVIL ACTION commenced in the Superior Court Department on June 6, 1980.

The case was tried before *Cross, J.*

The Supreme Judicial Court granted a request for direct appellate review.

*David A. Wojcik* (*John A. Mavricos* with him) for the defendant.

*Alan R. Goodman & Joseph Glannon* for the plaintiffs.

*Peter A. Donovan, David S. Shrager* of Pennsylvania, *Thomas F. Lambert, Jr., Camille F. Sarrouf & Frederick N. Halstrom*, for Association of Trial Lawyers of America, amicus curiae, submitted a brief.

*Demitrios M. Moschos*, for Massachusetts Municipal Association, amicus curiae, submitted a brief.

*Michael F. Magistrali*, Assistant Corporation Counsel, & *Crispin Birnbaum* for the city of Boston, amicus curiae, submitted a brief.

*Philip W. Bouchard*, for Mothers Against Drunk Drivers, amicus curiae, submitted a brief.

HENNESSEY, C.J. The plaintiffs commenced this action against the defendant town of Ware (town), under G. L. c. 258. They charge that police officers of the town negligently failed to

take into protective custody a motor vehicle operator who was under the influence of intoxicating liquor and who subsequently caused an accident resulting in harm to the plaintiffs. The jury returned special verdicts for the plaintiffs in the amount of $873,697. The town filed motions for judgments notwithstanding the verdicts, or, in the alternative, for a reduction of the jury's award. The trial judge denied the town's motion for judgments notwithstanding the verdicts, and reported the motion for a reduction of the jury's award to the Appeals Court. The town then filed a notice of appeal from the denial of the motion for judgments notwithstanding the verdicts by the trial judge, as well as on several evidentiary matters. The plaintiffs filed a motion for a new trial as to damages only for count four of their complaint.[2] The trial judge took no action on the motion and further reported the denial of the town's motions for judgments notwithstanding the verdicts, and summarized his reported questions. We allowed the plaintiffs' application for direct appellate review.[3]

We conclude that there must be a new trial because of the improper admission in evidence of the blood alcohol levels of the two motor vehicle operators.

The trial judge reported the following three questions: "1. Is the Defendant, Town of Ware, liable for acts of its police officer employees in the circumstances of this case? 2. If the answer to question 1 is in the affirmative, then does the limitation clause of G. L. c. 258, § 2 apply to the damages awarded by the jury? 3. If the answer to question 2 is in the affirmative, then does the limitation apply a. to each cause of action; or b. to each individual plaintiff or c. to all plaintiffs collectively for injuries sustained in the same 'incident.'" By answering the reported questions, we shall address many of the issues raised in the town's appeal from the trial judge's denial of its

---

[2] This count was for the death of Misty Jane Irwin.

[3] We appreciate the helpful analysis provided by the amicus curiae briefs filed by the Massachusetts Municipal Association, the city of Boston, Mothers Against Drunk Drivers, and the Association of Trial Lawyers of America.

various motions.[4] Those not reached in that context will be addressed separately.

1. *Evidence of Blood Tests.*

The town's major evidentiary challenge to the jury's verdicts focuses on the admission of evidence relating to the alcohol content level of the blood of Donald Fuller, the vehicle operator who was detained briefly by the police and released. The town made a timely objection to admission of the evidence at trial and argues on appeal that its admission was prejudicial error requiring a new trial.

The evidence at issue is the representations made in a letter purporting to record the results of a test done on blood drawn from Fuller immediately after the accident. The letter was sent by Dr. Patrick Foley, as chief of the Clinical Chemistry Department of Laboratory Medicine at the University of Massachusetts Medical Center, to Dr. Benjamin Schneider, medical examiner in Ware at that time. It stated in relevant part the following: "Dr. Schneider: We have carried out blood alcohol analysis on the two specimens submitted to us by the Ware Police Department. The results are as follows: Donald Fuller 202 mg/100 ml blood. Mark Irwin 19 mg/100 ml blood." The town argues this letter is inadmissible under the business records exception to the hearsay rule. See G. L. c. 233, § 78. It first claims that the letter was not a record kept in the ordinary course of business. Second, it asserts that, even if the letter is admissible as a business record kept in the ordinary course of business, the test results included in the letter are not admissible. According to the town, the test results are "second level hearsay." It argues that, because the plaintiffs presented no evidence regarding the procedures followed or persons involved in extracting and labeling the tested blood samples from Fuller and Irwin, the test results cannot be said to have been recorded

---

[4] It will be seen that the dissenting Justices are of the opinion that the town of Ware should not be held liable for the acts of its police officers in the circumstances of this case, but the dissenters agree that, if they were to reach the issue of the limitation of damages, they, like the majority, would conclude that the $100,000 limitation clause of G. L. c. 258, § 2, is to be applied on a "per-plaintiff" basis.

in the ordinary course of business and that they are, therefore, not admissible under the business records exception. Finally, the town states that the test results are inadmissible as the chain of custody of the blood has not been established. We agree that the letter should not have been admitted in evidence.

"General Laws c. 233, § 78, states that a record made in the regular course of business 'shall not be inadmissible because . . . it is hearsay.' Such a record is presumed to be reliable and therefore admissible because entries in these records are routinely made by those charged with the responsibility of making accurate entries and are relied on in the course of doing business." *Wingate* v. *Emery Air Freight Corp.*, 385 Mass. 402, 406 (1982). Clearly, the letter admitted here was not a record made in the regular course of business within the meaning of the statute. The letter, far from being a routine and regular recording, was a summation of expert opinion. The letter also fails to qualify under the statute because the writer clearly relied upon information from other persons and it was not shown that those persons had reported that information as business routine.

We have said that the preparer of a business record need not have personal knowledge of a fact being recorded, but the preparer may not "rely on statements that are not themselves a part of the regular course of business record-keeping." *Wingate* v. *Emery Air Freight Corp.*, *supra*. "The preparer's hearsay sources must carry the same indicia of reliability, arising from regularity and business motives, that bring his own act of recording the information within the statutory exception. Thus, unless statements on which the preparer relies fall within some other exception to the hearsay rule, the proponent must show that all persons in the chain of communication, from the observer to the preparer, reported the information as a matter of business duty or business routine." *Id*. See *Bouchie* v. *Murray*, 376 Mass. 524, 528-529 (1978). The plaintiffs made no such showing. There is no evidence regarding who drew and labeled the test blood samples, how they were drawn, when they

were drawn, or where they were drawn.[5] Accordingly, the results of the blood tests are inadmissible under the business records exception to the hearsay rule.

We focus the issue of the admissibility of the blood tests more accurately, however, by stating that the evidence in the form it was offered was inadmissible on materiality or relevance grounds, for lack of proper foundation in establishing a chain of custody. See, e.g., *Nesci* v. *Angelo,* 249 Mass. 508, 510 (1924); *Bauer* v. *Veith,* 374 Mich. 1, 4 (1964) ("[A blood] test and its results are inadmissible in the absence of proof that the blood specimen analyzed was actually taken from the person in scrutiny or the body of that person"); *Amaro* v. *City of N.Y.,* 40 N.Y.2d 30, 35-36 (1976) ("The chain of custody of any blood sample must be established . . . and the failure to do so may be excused only where the circumstances provide reasonable assurances of the identity and unchanged condition of the sample . . ."); *Robinson* v. *Life & Casualty Ins. Co.,* 255 N.C. 669, 672 (1961) ("[W]hether or not a blood alcohol test is admissible depends upon a showing of compliance with conditions as to relevancy . . . , tracing and identification of specimen . . . . [A] foundation must be laid before this type of evidence is admissible"). This is not a case where some specific evidence linking the blood sample to Fuller has been introduced and, therefore, any "weaknesses in the chain of custody . . . would go to the weight of the evidence rather

---

[5] An answer by the town to one of the plaintiffs' interrogatories stated that Officer Willard Power transported the blood to the University of Massachusetts Medical Center for testing. This alone does not establish personal knowledge of whose blood was being transported or a sufficient chain of custody. Nor does an entry in the police log, which log was not admitted in evidence, that the medical examiner drew the blood from Fuller, establish this fact. First, the medical examiner himself stated in deposition testimony, which was excluded at trial, that he did not draw Fuller's blood. Second, the representation from the police log was read to the jury by Officer Philip Aucoin, but no foundation was laid by which this out-of-court statement could have been admitted for the truth of the matter it asserted. See *Kelley* v. *O'Neil,* 1 Mass. App. Ct. 313, 316-317 (1973), and cases cited. In addition, Officer Aucoin himself admitted that he did not base the entry in the police log on any personal knowledge. See *Wingate* v. *Emery Air Freight Corp., supra* at 406.

than to its admissibility." *Commonwealth* v. *Hogg,* 365 Mass. 290, 294-295 (1974). Insufficient evidence was introduced to make the necessary link between Fuller and the blood tested. See generally *Commonwealth* v. *Rodriquez,* 364 Mass. 87, 94-95 (1973).

The plaintiffs argue that, even if the blood tests were improperly admitted in evidence, the error is harmless. We disagree. The letter stated that the alcohol content of blood extracted from Fuller immediately after the accident was "202 mg/100 ml blood."[6] Testimony was presented to the jury that a person whose blood alcohol content was at this level would stagger, have double vision, have difficulty estimating speed and distances, have slurred speech, have impaired judgment, and probably could not stand up with closed eyes without holding on to something. We think that such testimony fairly viewed would have been significant to the jury in their determination whether the town's police officers were negligent in failing to remove Fuller from the roadway. Thus, the town's substantive rights clearly were impaired by erroneous admission of the blood test results. See G. L. c. 231, § 119; *Wingate* v. *Emery Air Freight Corp., supra* at 407. The prejudicial nature of the blood test results requires that a new trial be granted.[7]

---

[6] Under G. L. c. 90, § 24 (1) (*e*), there is a presumption that a defendant is under the influence of intoxicating liquor where the percentage, by weight, of alcohol in the defendant's blood is ten one-hundredths of one per cent. Testimony was introduced that "202 mg/100 ml blood" is approximately a percentage, by weight, of alcohol in a person's blood of twenty one-hundredths of one per cent.

[7] The prejudicial nature of the blood test results likely was increased by the plaintiffs' efforts in closing argument to minimize the suggestion that the blood tested may not have been Fuller's. Counsel for the plaintiffs stated that "[w]e know that the blood samples were drawn by Dr. Schneider." Dr. Schneider was the medical examiner for the town of Ware. This representation of his involvement with the samples may have added some reliability to the test results in the minds of the jury. The representation arguably, however, goes beyond the record. The testimony introducing this fact was a written statement read by Officer Aucoin from a police log. The log was not admitted in evidence and the statement recorded in the log was not based on personal knowledge. Nonetheless, the testimony was admitted over the town's timely objection. While the testimony was admitted, it is unclear whether it was admitted for the truth of the matter asserted or only

As will be seen, *infra,* the town's motions for directed verdicts, or for judgments notwithstanding the verdicts, are not implicated in our ruling. Aside from the blood test evidence, there was sufficient evidence of Fuller's condition as to inebriety to warrant submission of the case to the jury.

2. *Applicability of G. L. c. 258, § 2.*

Whether the town is liable to the plaintiffs for the negligence of its police officers depends initially upon the scope of G. L. c. 258, the so called Massachusetts Tort Claims Act (Act). As to scope, the Act provides in relevant part that "[p]ublic employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances." G. L. c. 258, § 2, as appearing in St. 1978, c. 512, § 15. The Act exempts from such liability, however, "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused." G. L. c. 258, § 10 (*b*). As a threshold matter, therefore, we must determine whether the challenged actions of the police officers were outside the Act as "discretionary functions" within the meaning of G. L. c. 258, § 10 (*b*).

The town contends that the statutes setting forth an officer's authority with respect to intoxicated motor vehicle operators "indicate that the arrest of Fuller, assuming, *arguendo,* that he was intoxicated, was discretionary and not mandatory." Whether an act is itself discretionary, of course, does not turn on whether that act was negligently or nonnegligently performed. Therefore, we need not consider how the act was per-

---

to show the statement had in fact been written. If it was admissible only for the latter purpose, plaintiffs' counsel's use of it in his closing statement to establish Dr. Schneider had drawn the blood from Fuller was improper. In closing argument, counsel may refer only to the evidence and the fair inferences from the evidence. *Commonwealth* v. *Clary,* 388 Mass. 583, 590 (1983).

formed in this case to determine whether it is discretionary. Rather, we must address only a more general question: Is the decision of a police officer to remove from the roadways a driver who he knows or has reason to know is intoxicated a discretionary act within the meaning of G. L. c. 258, § 10 (*b*). We conclude it is not.

To determine the intended scope of G. L. c. 258, § 10 (*b*), we have stated that the language in *Whitney* v. *Worcester,* 373 Mass. 208 (1977), should be our guide. *Irwin* v. *Commissioner of the Dep't of Youth Servs.,* 388 Mass. 810, 817 (1983). In *Whitney* v. *Worcester, supra* at 219, we noted that immunity for discretionary functions did not extend to all acts requiring judgment because "the performance of all functions involves the exercise of discretion and judgment to some degree." We described discretionary acts as those "characterized by the high degree of discretion and judgment involved in weighing alternatives and making choices with respect to public policy and planning." In contrast, we explained that not counted among such acts are those which involve "the carrying out of previously established policies or plans." *Id.* at 218.

No reasonable basis exists for arguing that a police officer is making a policy or planning judgment in deciding whether to remove from the roadways a driver who he knows is intoxicated. Rather, the policy and planning decision to remove such drivers has already been made by the Legislature. See G. L. c. 90, §§ 21, 24 (*f*); c. 90C, § 2; c. 111B, § 8; c. 41, § 98. This is not to say every harm resulting from the conscious failure of a police officer to remove an intoxicated driver from the roadway will give rise to liability for the public employer. There may be situations in which an officer's failure to remove an intoxicated driver from the roadway will not lead to such liability. Where liability does not result, however, it will be because some element of the tort alleged will not have been established. It will not be because the act of the officer is discretionary within the meaning of G. L. c. 258, § 10 (*b*). To hold otherwise would violate the Legislature's intent that the Act be "construed liberally for the accomplishment of [its] purposes." St. 1978, c. 512, § 18. The primary purpose of the

Act is "to provide an effective·remedy for persons injured as a result of the negligence of governmental entities in the Commonwealth." *Vasys* v. *Metropolitan Dist. Comm'n,* 387 Mass. 51, 55 (1982).[8]

3. *Tort Principles.*

In addressing whether Officers Power and Aucoin owed the plaintiffs a duty to remove Fuller from the roadways, "we start with the basic principle that the abrogation of the doctrine of governmental immunity by the Act simply removed the defense of immunity in certain tort actions against . . . municipalities. . . . It did not create any new theory of liability for a municipality. . . . In order to recover against the town for negligence, the plaintiffs must show (1) the existence of an act or omission in violation of a (2) duty owed to the plaintiffs by the defendant, (3) injury, and (4) a causal relationship between the breach of duty and the harm suffered." *Dinsky* v. *Framingham,* 386 Mass. 801, 804 (1982). The town argues these necessary elements of tort liability have not been established.

The town does not argue that its police officers owed no duty of reasonable care "to enforce the statutes with respect to intoxicated operators of motor vehicles." We, therefore, assume for the purposes of this case that the town concedes its police officers had a duty to enforce such statutes and do not need to address the issue separately. Rather the town claims the duty its police officers owed was to the "general public." Relying on our earlier opinion in *Dinsky* v. *Framingham, supra,* the town asserts that, because this duty is owed to the general public only, the "public duty" rule extends to prevent private negligence actions against public employers for harm proximately caused by a police officer's violation of his duty

---

[8] We also reject the town's contention that a finding of more than "ordinary negligence" is required to find a municipality liable in the circumstances of this case. The town relies on our decision in *Gildea* v. *Ellershaw,* 363 Mass. 800, 820 (1973), for this proposition. The town's position is flawed because G. L. c. 258 is now the controlling authority governing negligence actions based upon negligent acts committed by public employees. The "discretionary function" provision of G. L. c. 258, § 10 (*b*), addresses the concerns we raised in *Gildea.*

owed the general public. Accordingly, the town claims that no private negligence action may be maintained against it for harm proximately caused by its police officers' failure to remove an intoxicated motor vehicle operator from the roadways. We disagree with the town and conclude the public duty rule does not bar the plaintiffs' action.

In *Dinsky,* we relied in part on the principle that the negligence of a public employee occurring within the scope of his employment will not support a private action against the public employer where the employee's duty of care was owed to the general public only. Arguably, this principle contains a seed which could reintroduce a broad-based municipal tort immunity: whereas most public employees when acting within the scope of their employment ultimately are doing so in furtherance of the public good broadly defined, the principle of "public duty" discussed in *Dinsky* would exempt public employers from tort liability for the negligence of most public employees. Presumably, only where the Legislature specifically designated an identifiable sub-class as the intended beneficiaries of certain public acts would a public employer be open to tort liability. See *Halvorson* v. *Dahl,* 89 Wash. 2d 673, 676 (1978). Clearly, such a broad reading of our *Dinsky* opinion runs directly contrary to the spirit of G. L. c. 258 and our decision in *Whitney* v. *Worcester,* 373 Mass. 208 (1977). We did not intend our language in *Dinsky* to be so read.

There are fundamental flaws in the town's effort to apply the rationale of *Dinsky* to the instant case. As the plaintiffs correctly point out, our decision in *Dinsky* was narrowly limited to the public inspection context. The cases we relied on arose solely in that context and are of limited application here. See *Dinsky, supra* at 805-809. We concluded that there was no intention in the statutes or the State Building Code to benefit purchasers of premises which were developed in violation of governmental requirements. *Id.* at 809-810. In contrast, as we shall show *infra,* the applicable statutes in this case create a duty to the motoring public with respect to intoxicated motorists discovered by the police upon which tort liability may be based. The town, however, seems to conclude from our language in

*Dinsky* that, by definition, one cannot be a member of the general public and yet have the requisite special relationship with a public employee to maintain a tort action against the public employer. This conclusion is erroneous. Unlike *Dinsky* and its relatively leisurely course of events, the threat here (intoxicated driving) is immediate; it threatens serious physical injury; the threat is short-lived, unlike negligent landscaping; and the plaintiffs (the motoring public) have no chance to protect themselves. Where the risk created by the negligence of a municipal employee is of immediate and foreseeable physical injury to persons who cannot reasonably protect themselves from it, a' duty of care reasonably should be found. Those circumstances occur here; they are not present in *Dinsky.*

A duty to act with reasonable care to prevent harm to a plaintiff which, if violated, may give rise to tort liability is based on a "special relationship" between the plaintiff and the defendant. See W. Prosser, Torts § 56 (4th ed. 1971). While several different categories of such special relationships are recognized in the common law, they are based to a large extent on a uniform set of considerations. Foremost among these is whether a defendant reasonably could foresee that he would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so. See *Pridgen* v. *Boston Hous. Auth.,* 364 Mass. 696, 709-711 (1974); *Bradley Center, Inc.* v. *Wessner,* 250 Ga. 199, 202 (1982); *Lorshbough* v. *Buzzle,* 258 N.W.2d 96, 102 (Minn. 1977); *DeLong* v. *County of Erie,* 60 N.Y.2d 296, 304-305 (1983); *Petersen* v. *State,* 100 Wash. 2d 421, 428-429 (1983); *McLeod* v. *Grant County School Dist. No. 128,* 42 Wash. 2d 316, 321 (1953). Cf. *H.R. Moch Co.* v. *Rensselaer Water Co.,* 247 N.Y. 160, 167 (1928); Harper & Kime, The Duty to Control the Conduct of Another, 43 Yale L.J. 886, 887-888 (1934). It has been said that such foreseeability can be based on reasonable reliance by the plaintiff, impeding other persons who might seek to render aid, statutory duties, property ownership or some other basis. As the harm which safely may be considered foreseeable to the defendant changes with the evolving expectations of a maturing society, so change the

"special relationships" upon which the common law will base tort liability for the failure to take affirmative action with reasonable care. See *Mullins* v. *Pine Manor College*, 389 Mass. 47, 51 (1983); *Pridgen* v. *Boston Hous. Auth., supra* at 711.

We have discerned such a special relationship in cases addressing the liability of private parties to members of the general driving public where alcohol and driving were involved. These cases are at least analogous to the case before us. In *Adamian* v. *Three Sons, Inc.,* 353 Mass. 498 (1968), we considered one type of liability arising in connection with alcohol consumption and motor vehicle operation. The defendant was the owner of a restaurant and barroom. The defendant negligently continued serving alcohol to one patron and allegedly caused him to become greatly intoxicated. Subsequently, the patron left the restaurant, entered his automobile, and proceeded to drive away. The vehicle driven by the patron shortly thereafter collided with the automobile in which the plaintiff and his intestate were riding. At issue in *Adamian* was whether the defendant could be held liable for damage caused by a patron which occurred outside the defendant's premises. We reasoned that the duty of reasonable care to prevent foreseeable harm owed by a tavern keeper to his patrons is well settled. See *Kane* v. *Fields Corner Grille, Inc.,* 341 Mass. 640, 641 (1961). In so concluding, we focused on G. L. c. 138, § 69, which prohibits the sale of alcohol to intoxicated persons and observed as follows: "The statute . . . was undoubtedly enacted with a purpose to safeguard, not only the intoxicated person himself, but members of the general public as well." This led us to conclude that the defendant could be liable to members of the general public riding on roadways whose harm was proximately caused by the violation of G. L. c. 138, § 69. See *Adamian, supra* at 500-501 ("Henceforth in this Commonwealth waste of human life due to drunken driving on the highways will not be left outside the scope of the foreseeable risk created by the sale of liquor to an already intoxicated individual"). Cf. *Cimino* v. *Milford Keg, Inc.,* 385 Mass. 323, 326-328 (1982).

We reached a similar conclusion in *Michnik-Zilberman* v. *Gordon's Liquor, Inc.,* 390 Mass. 6 (1983). In *Michnik-Zilber-*

*man,* we addressed the scope of a liquor store owner's civil liability for the sale of alcohol to a minor. The defendant in that case sold alcohol to a minor who became intoxicated. While intoxicated, the minor drove an automobile which collided with and killed a cyclist. The defendant argued that his negligence as to the deceased cyclist could not be shown by his violation of G. L. c. 138, §§ 34, 69, proscribing the sale of alcohol to a minor. We rejected the defendant's position. We stressed that, while the primary focus of G. L. c. 138, §§ 34, 69, was to protect minors from alcohol consumption, the statute's "broadly expressed restrictions were not narrowly intended to benefit the minors and intoxicated persons alone but were wisely intended for the protection of members of the general public as well." *Michnik-Zilberman, supra* at 10-11, quoting *Rappaport* v. *Nichols,* 31 N.J. 188, 201-202 (1959). The statutes in that case were viewed as "fixing a standard for all members of the community, from which it [was] negligence to deviate." *Id.* at 11, quoting W. Prosser, Torts § 36, at 190 (4th ed. 1971). We concluded that a vendor who violates the statute is liable for all harm proximately caused. In so doing, we observed that "the vendor need not foresee the particular kind of harm which might occur from its negligent sales. Of course, the act and the harm must be reasonably foreseeable. One of the more foreseeable risks is that the minor may drive and cause harm to third persons while intoxicated. See *Cimino* v. *Milford Keg, Inc.,* 385 Mass. 323, 332 (1982)." *Id.* at 12. Accordingly, the *Michnik-Zilberman* decision rests in part on the principle that a private party may be liable to members of the *general public* for reasonably foreseeable harm proximately caused by the violation of a statutorily defined standard of conduct.

The *Adamian* and *Michnik-Zilberman* decisions involve special relationships between defendants and plaintiffs giving rise to liability between a defendant and a member of the general public. While these decisions address the liability of private defendants, the analysis contained in them may be applied by analogy to the instant case as well. Under the Act, public employers are treated "in the same manner and to the same

extent as a private individual under like circumstances . . . ."
G. L. c. 258, § 2. At issue, therefore, is whether the standard
of care owed to the general public by the town through its
police officers in the instant case implies a similar special
relationship. The existence of such a special relationship would
allow for private negligence actions and make inapplicable the
public duty rule. The statutes defining the privileges and duties
of the police imply such a special relationship.

Just as the duty of the defendants in *Adamian* and *Michnik-
Zilberman* was rooted, at least in part, in statutory respon-
sibilities, so the proper conduct of public law enforcement
personnel with regard to intoxicated motor vehicle operators
is provided by several statutes. First, there are statutes giving
police officers the right to deal with intoxicated persons: "Any
officer authorized to make arrests . . . may arrest without
warrant any person . . . who the officer has probable cause to
believe has operated or is operating a motor vehicle while
under the influence of intoxicating liquor," G. L. c. 90, § 21,
as appearing in St. 1973, c. 461, § 1; "Whoever operates a
motor vehicle upon any way or in any place to which the public
has right of access . . . shall be deemed to have consented to
submit to a chemical test or analysis of his breath or blood in
the event that he is arrested for operating a motor vehicle while
under the influence of intoxicating liquor . . . . Such test shall
be administered at the direction of a police officer . . . having
reasonable grounds to believe that the person arrested has been
operating a motor vehicle . . . while under the influence of
intoxicating liquor," G. L. c. 90, § 24 (1) (*f*), as amended
through St. 1980, c. 383, § 2; "Any person who is incapaci-
tated may be assisted by a police officer with or without his
consent to his residence, to a facility or to a police station. To
determine . . . whether or not such person is intoxicated, the
police officer may request the person to submit to reasonable
tests," G. L. c. 111B, § 8, as appearing in St. 1979, c. 597,
§ 1. Next, there are statutes requiring police officers to act.
A police officer must, at least, issue a record upon a citation
for each automobile law violation. G. L. c. 90C, § 2. General
Laws c. 90, § 24 (1) (*a*) (1), makes driving while intoxicated

an automobile law violation. Similarly, "police officers of all
cities and towns . . . shall suppress and prevent all disturbances
and disorder" G. L. c. 41, § 98, as amended through St. 1970,
c. 181.

An argument can be made that *Adamian* and *Michnik-Zilber-
man* have limited application here, even by analogy, because
the defendants in those cases contributed, by the sale of al-
coholic beverages, to the state of intoxication of the offending
drivers. This argument ignores the fact that police can be found
to be in neglect of statutory responsibilities by mere failure to
act when confronted by an intoxicated driver. Furthermore,
many cases have established that liability may arise solely from
the violation of an affirmative duty to act with reasonable care
to prevent harm to another caused by a third person. See, e.g.,
*Mullins* v. *Pine Manor College,* 389 Mass. 47, 54 (1983)
(college has duty to protect resident students); *Carey* v. *New
Yorker of Worcester, Inc.,* 355 Mass. 450, 452 (1969) (res-
taurateur has duty to patron); *Quigley* v. *Wilson Line of Mass.,
Inc.,* 338 Mass. 125, 129-130 (1958) (common carrier has
duty to protect passengers); *Rawson* v. *Massachusetts Oper-
ating Co.,* 328 Mass. 558, 560 (1952) (theater owner has duty
to protect patrons). See also *International Distrib. Corp.* v.
*American Dist. Tel. Co.,* 569 F.2d 136, 139 (D.C. Cir. 1977)
(employer's duty to foreseeable plaintiff for failure to supervise
employees); *Keating* v. *Jones Dev. of Mo., Inc.,* 398 F.2d
1011, 1014-1015 (5th Cir. 1968) (motel owner's duty to prevent
harm to guest by third party in swimming pool on premises);
*Wanca* v. *Penn Indus., Inc.,* 260 F.2d 350 (2d Cir. 1958)
(employer's duty to protect bystander from dangerous em-
ployee); *Bradley Center, Inc.* v. *Wessner,* 250 Ga. 199, 201-
202 (1982) (private mental hospital's duty to protect foreseeable
plaintiff from patient); *Stalzer* v. *European Am. Bank,* 113
Misc. 2d 77, 81-83 (N.Y. Civ. Ct. 1982) (bank's duty to
protect patrons); *Nolechek* v. *Gesuale,* 46 N.Y.2d 332, 340
(1978) (parent's duty to protect third parties from child's use
of dangerous instrument); *Eldredge* v. *Kamp Kachess Youth
Serv., Inc.,* 90 Wash. 2d 402, 408 (1978) (group child care
facility's duty to control acts of delinquent children).

Such a duty to prevent harm to another caused by a third person has been recognized for public employees as well as private individuals. See, e.g., *Ryan* v. *State*, 134 Ariz. 308, 309-311 (1982) (jailor's duty to plaintiff from negligent release of inmate; overruling *Massengill* v. *Yuma County,* 104 Ariz. 518 [1969], which found no specific duty to stop speeding intoxicated driver); *Hoyem* v. *Manhattan Beach City School Dist.,* 22 Cal. 3d 508, 513-520 (1978) (duty to protect student who left school premises from third person); *Tarasoff* v. *Regents of the Univ. of Cal.,* 17 Cal. 3d 425, 435 (1976) (duty of therapist to warn others of patient's dangerous tendencies); *Green* v. *Livermore,* 117 Cal. App. 3d 82, 90-91 (1981) (police officer's duty to protect motorist form arrested intoxicated driver's passengers who take over control of vehicle after officer departs); *Mann* v. *State,* 70 Cal. App. 3d 773, 780 (1977) (police officer's duty to protect stranded motorists from traffic dangers where officer has stopped to help); *Sestito* v. *Groton,* 178 Conn. 520, 526 (1979) (police officer's duty to protect bystander from "melee"); *Rupp* v. *Bryant,* 417 So. 2d 658, 665 (Fla. 1982) (duty of school principal and faculty member to supervise student organization); *Commercial Carrier Corp.* v. *Indian River County,* 371 So. 2d 1010, 1015-1022 (Fla. 1979) (duty to protect motorists from others by maintaining traffic signals); *Huhn* v. *Dixie Ins. Co.,* 453 So. 2d 70, 75-76 (Fla. Dist. Ct. App. 1984) (police officer's duty to remove from roadway visibly intoxicated motorist); *Nelson* v. *Spalding County,* 249 Ga. 334, 336-337 (1982) (duty to protect motorists from others by maintaining traffic signs); *Pippin* v. *Chicago Hous. Auth.,* 78 Ill. 2d 204, 209 (1979) (duty to hire competent security guards to protect tenants); *DeLong* v. *County of Erie,* 60 N.Y.2d 296, 304-305 (1983) (duty to prevent harm to caller of emergency "911" telephone number); *Petersen* v. *State,* 100 Wash.2d 421, 428-429 (1983)(public hospital facility's duty to protect foreseeable plaintiffs from patients); *McLeod* v. *Grant County School Dist. No. 128,* 42 Wash. 2d 316, 323-324 (1953) (duty to protect student from student third party at recess). Cf. *Slaven* v. *Salem,* 386 Mass. 885, 887-888 (1982) (discussing duty of

jailor to inmate); *Whitney* v. *Worcester,* 373 Mass. 208, 223
(1977) (discussing liability of public employees for failure to
act); *Pridgen* v. *Boston Hous. Auth.,* 364 Mass. 696, 709-711
& n.7 (1974) (discussing affirmative duty of property owner
to act to aid trespasser known to be in danger). Contra *Harris*
v. *Smith,* 157 Cal. App. 3d 100 (1984); *Shore* v. *Stonington,*
187 Conn. 147 (1982); *Evers* v. *Westerberg,* 32 N.Y.2d 684
(1973).

We conclude that there is a special relationship between a
police officer who negligently fails to remove an intoxicated
motorist from the highway, and a member of the public who
suffers injury as a result of that failure. The statutes which
establish police responsibilities in such circumstances evidence
a legislative intent to protect both intoxicated persons and other
users of the highway. As to the most crucial factor — foreseea-
bility — the calamitous consequences to the victims of acci-
dents caused by drunken driving are all too predictable.

The town raises several policy arguments. In urging us to
find the alleged negligence of the town's police officers not
actionable under G. L. c. 258, the town states that the economic
hardship resulting from judgments for the plaintiffs will be
intolerable and that in the future the town will be subject to
limitless damage claims. It is true that the rule of municipal
immunity was founded on protecting the defendants' funds.
The argument of the town ignores the obvious fact that the
Legislature, by enacting G. L. c. 258, chose to put the public
funds at risk. The town's argument might be more effective
if the Legislature had not imposed a $100,000 limitation. The
threat to public funds without such a limitation is not controlling
because of the limitation, as it might be without the limitation.

In addition, the town claims we must focus on the difficulty
inherent in determining whether a driver is intoxicated. The
town asserts that imposing liability on police officers for neg-
ligence in making this "often impossible judgment task" will
lead police officers to arrest drivers whenever they suspect
intoxication rather than not arrest them and risk a negligence
action against the public employer. The town asserts this result-
ing inclination to arrest will chill constitutionally protected free-

doms of the general public. In the alternative, the town adds, the police may avoid interfering in doubtful cases, for fear of tort actions by arrested persons, and this too would not be in the public interest. We think these considerations are speculative at best. More important, they are simply not relevant to the issue whether the police have a duty.

4. *Sufficiency of the Evidence.*

We now consider whether there was sufficient evidence to support findings that the town's police officers were negligent and that their negligence was the proximate cause of the plaintiffs' injuries. In considering the judge's rulings on the motions for directed verdicts, which were denied, and for judgments nowithstanding the verdicts, we review the evidence in the light most favorable to the plaintiffs. See *Michnik-Zilberman* v. *Gordon's Liquor, Inc.,* 390 Mass. 6, 7 n.1 (1983); *Poirier* v. *Plymouth,* 374 Mass. 212 (1978).

At about 2 A.M., on May 14, 1978, Officer Power of the Ware police department was patrolling Main Street in Ware. He passed the Cue N' Cushion Lounge, a popular downtown lounge on the corner of Parker Street. At that time a car "peeled out" from the side of the lounge, and Officer Power heard "squealing tires." Officer Power testified that he "looked up Parker Street saw two tail-lights" and followed the car up Parker Street. He got behind the vehicle and put on his blue flashers and "pulled [it] over," for driving too fast under the circumstances. Officer Power approached the driver of the vehicle, Fuller, who handed him a license and registration. Fuller told Officer Power he had consumed "a couple of beers." Officer Power could smell alcohol on Fuller's breath. Although he was carrying a flashlight, Officer Power never used it to illuminate the inside of the car or Fuller's face or eyes. After Officer Power had talked with Fuller for about two minutes, another Ware police officer, Philip Aucoin, arrived on the scene. Officer Power then left Fuller to talk with Officer Aucoin. An eyewitness testified that, while the two officers were talking and not watching Fuller, Fuller was swaying, unsteady on his feet, holding his hands up to his head, moving back and forth and holding onto the top of the door to steady himself. That witness was

a nurse who observed Fuller from the window of her home for approximately five minutes. The vehicles were parked in front of her driveway. After talking with Officer Aucoin, Officer Power returned to Fuller. He spoke with him for about one minute and returned his license and registration. Power conducted no field sobriety test of Fuller. Power then returned to his cruiser and drove past Fuller, who was still parked. According to the same eyewitness, Fuller got into his car, moving very slowly and unsteadily. After pausing for a minute, Fuller drove away. The eyewitness testified that in her opinion Fuller was intoxicated.

Approximately ten minutes after Fuller was stopped by Officer Power, the vehicle Fuller was driving collided head-on with that in which the plaintiffs were riding. Fuller's vehicle was travelling at a speed between sixty-five and seventy-five miles an hour at the time of the collision. Fuller and Mark Irwin, the driver of the other vehicle, and Misty Jane Irwin, a passenger in the back seat, died as a result of the crash. The two other passengers in the plaintiffs' vehicle, Debbie Irwin and her son Steven suffered severe injuries. Remnants of two coolers, brown glass, and the smell of alcohol were detected near Fuller's vehicle at the scene of the collision. Upon telling the mother of Mark Irwin about the crash, Officer Power, in the presence of Officer Aucoin, struck a table with his fist and said, "I told you we should have kept him."

On all the evidence, and ignoring the evidence of alcohol levels of the blood, which should not have admitted in evidence in the manner it was offered, we conclude that the jury could have found that the town's police officers had a duty to the plaintiffs and that the police officers' negligence proximately caused the plaintiffs' injuries. "Usually 'the question of negligence is one of fact for the jury. Only when no rational view of the evidence warrants a finding that the defendant was negligent may the issue be taken from the jury.'" *Mullins* v. *Pine Manor College,* 389 Mass. 47, 56 (1983), quoting *Zezuski* v. *Jenny Mfg. Co.,* 363 Mass. 324, 327 (1973). One eyewitness testified that Fuller was visibly intoxicated and unsteady on his feet while he was being detained. Officer Power testified

that he smelled alcohol on Fuller's breath, that Fuller admitted that he had been drinking and that Fuller had been stopped for driving too fast. Officer Power nevertheless made no effort to conduct a field sobriety test to determine whether Fuller was intoxicated. These facts properly before the jury were sufficient to warrant the rational finding that the town's police officers were negligent in failing to fulfil their duty of care to the plaintiffs which we have established based on the statutes discussed above. See *LaClair* v. *Silberline Mfg. Co.*, 379 Mass. 21, 28 (1979) ("[A] violation of a safety statute or like enactment, while not conclusive on the ultimate issue of civil liability, is evidence of a violator's negligence as to all consequences that the statute was intended to prevent").

Similarly, "[t]he question of causation is generally one of fact for the jury. *Zezuski* v. *Jenny Mfg. Co., supra* at 327. A plaintiff need only show 'that there was greater likelihood or probability that the harm complained of was due to causes for which the defendant was responsible than from any other cause.'" *Mullins* v. *Pine Manor College, supra* at 58, quoting *Carey* v. *General Motors Corp.*, 377 Mass. 736, 740 (1979). In *Cimino* v. *Milford Keg, Inc.*, 385 Mass. 323 (1982), we addressed the evidence a plaintiff must introduce for a jury to find a tavern owner's sale of liquor to an intoxicated person proximately caused the injury to a person travelling on the roadways: "It is only necessary for the plaintiff to prove that the defendant took a risk with respect to the plaintiff's safety that a person of ordinary prudence would not have taken, and that the plaintiff suffered a resulting injury that was within the foreseeable risk." *Id.* at 330. The evidence necessary to prove proximate causation is the same in this case.

The jury here found in a special verdict that negligence of the Ware police caused the plaintiffs' injuries. There was sufficient evidence for them so to find. The injuries suffered by the plaintiffs occurred no more than ten minutes after Fuller had left Officer Power, and it could be found that they were reasonably foreseeable consequences of permitting Fuller to drive away after being stopped. Cf. *Adamian* v. *Three Sons, Inc.*, 353 Mass. 498, 501 (1968).

5. *Limitation of Liability Under G. L. c. 258, § 2.*

The second and third questions reported by the trial judge are whether the limitation clause of G. L. c. 258, § 2, applies to the damages awarded by the jury and, if so, how the limitation should be applied.

General Laws c. 258, § 2, limits the amount of a public employer's liability for the negligent acts or omissions of its employees. It provides that while the public employer is "liable . . . in the same manner and to the same extent as a private individual under like circumstances . . . [it] shall not be liable . . . for any amount in excess of one hundred thousand dollars." We find nothing in this statutory language, and the parties present no arguments, that this limitation of liability should not apply to the jury verdicts here. We, therefore, conclude that it is applicable to them.

The parties do, however, contest how the limitation of damages should be applied. The town asserts that the limitation should be construed to limit the recovery of all plaintiffs for a singly injury-causing incident to an aggregate amount of $100,000, regardless of the number of plaintiffs in question. Alternatively, the town argues that the statute should at least be read to limit recovery to $100,000 per plaintiff. In contrast, the plaintiffs state emphatically that the per-claim theory (e.g., Debbie Irwin asserts two "claims," one for her personal injury and one for loss of consortium) is the proper interpretation of the Massachusetts Tort Claims Act. They argue that each plaintiff should be allowed to collect up to $100,000 for each separate claim based on a specific negligent act. Alternatively, they too argue that, if we do not adopt the per-claim theory, we should apply the limit per-plaintiff, rather than on the allegedly unreasonable per-incident basis.

We conclude that the language of G. L. c. 258, § 2, along with the purpose and design of G. L. c. 258 as a whole, demonstrates a legislative intent that the $100,000 limitation on liability be applied on a per-plaintiff basis.

We begin by rejecting the "per-incident" theory proposed by the town. General Laws c. 258, § 2, provides that "[p]ublic

employers shall be liable *for injury or loss of property or personal injury or death* caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances, except that public employers shall not be liable . . . for interest prior to judgment or for punitive damages or for any amount in excess of one hundred thousand dollars" (emphasis supplied). Significantly, the Legislature used the singular form of the nouns "injury," "loss," and "death" to describe the harm which gives rise to public employer liability. This is some indication that the statutory limitation applies to liability arising from a single claimant's injury, loss or death, rather than the aggregate harm of all claimants arising from a single injury-causing occurrence. If the Legislature had intended the limitation of liability to apply as an aggregate cap for all harm caused by a single negligent act, it presumably would have used the words "injur*ies*," "loss*es*,' and "death*s*" to describe the harm giving rise to the liability which is capped at $100,000. The Legislature did not do so. The next sentence of G. L. c. 258 § 2, bears this out. Stating that "[t]he remedies provided by this chapter shall be exclusive of any other . . . action . . . by reason of the same subject matter against . . . the public employee . . . *whose negligent . . . act or omission gave rise to such claim*," it likewise demonstrates that § 2 applies to the individual "claim" of a negligence victim, not to the "claims" of multiple claimants. Where the Legislature intended to encompass all claimants collectively, it knew how to do so. See G. L. c. 258, § 12, inserted by St. 1979, c. 1, § 1 ("[c]laims against the commonwealth . . . may be enforced in the superior court").

Supporting our rejection of the town's per-incident construction in G. L. c. 258, § 2, is cognate language in the Federal Tort Claims Act dircted at individual claimants. Cf. *Vasys* v. *Metropolitan Dist. Comm'n,* 387 Mass. 51, 54 (1982). Under 28 U.S.C. § 2674 (1976), the United States is liable without limitation, for employee negligence "in the same manner and to the same extent as a private individual under like circum-

stances, but shall not be liable for interest prior to judgment or for punitive damages." The next section, 28 U.S.C. § 2675 (a) (1976), provides that "[a]n action shall not be instituted upon *a claim* against the United States for money damages *for injury or loss of property or personal injury or death* caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, *unless the claimant shall have first presented the claim* to the appropriate Federal agency and *his claim* shall have been finally denied by the agency in writing . . . . The failure of an agency to make final disposition of *a claim* within six months after it is filed shall . . . be deemed a final denial of *the claim* for purposes of this section" (emphasis added). Our Legislature appropriated this language virtually verbatim, adding a $100,000 ceiling.[9] See G. L. c. 258, §§ 2, 4. The $100,000 limitation was added to language specifically applicable to the claim of an individual victim, not to collective injuries or aggregate claims. Had the Legislature intended to change the scope of the language from the Federal statute so as to render it applicable to the aggregate recovery of all victims, it could have done so explicitly, or at least have amended the language to read "injur*ies* or loss*es* of property or personal injur*ies* or death*s*," as discussed above.

In addition to being inconsistent with the statute's plain language, the town's per-incident theory runs counter to the general purpose and design of G. L. c. 258. The Legislature's overriding purpose in enacting the Massachusetts Tort Claims Act was to eradicate the "logically indefensible" doctrine of sovereign immunity, *Morash & Sons* v. *Commonwealth,* 363 Mass. 612, 619 (1973), and replace it with a statutory mechanism that would "allow plaintiffs with valid causes of action to recover in negligence against governmental entities in

---

[9] The presentation requirement and the six-month settlement period established by 28 U.S.C. § 2675 (a) (1976) were also incorporated in virtually identical language, in G. L. c. 258, § 4, which refers to "the claimant" and "his claim." For other similarities between the Federal and Massachusetts Tort Claims Acts, compare 28 U.S.C. § 2672 (1976) with G. L. c. 258, § 5, and 28 U.S.C. § 2680 (1976) with G. L. c. 258, § 10.

Massachusetts . . . in amounts which are reasonable and not inflated." *Vasys* v. *Metropolitan Dist. Comm'n,* 387 Mass. 51, 57 (1982). The Legislature certainly was not unaware that a public employee's negligence could result in the deaths or injuries of multiple victims. As this case demonstrates, a $100,000 maximum recovery, construed as applicable to the aggregate damages awarded for one incidence of negligence, could be entirely depleted by the serious injury or wrongful death of one victim. See note 13, *infra.* The consequent zero recovery of other negligence victims, though undeniably "not inflated," is hardly "reasonable," and places those victims in a position that is, if anything, worse [10] than the unjust situation G. L. c. 258 was enacted to remedy. We do not believe the Legislature had this result in mind when it enacted the $100,000 limit. Although the Legislature clearly intended a cautious application of government funds to compensate negligence victims, it also instructed that the provisions of the act be "construed liberally for the accomplishment of the purposes thereof." St. 1978, c. 512, § 18. Construing the statute to limit liability to $100,000 on a per-incident basis frustrates this intent.

The equally problematic alternative to the first come, first served method of apportionment inherent in a "per incident" construction of the liability cap is a distribution of the $100,000 on a pro rata basis. Had the Legislature intended the amount of each claimant's recovery to be contingent on amounts awarded to other claimants, it could have required that all claims arising from one incident be litigated together, and that

---

[10] General Laws c. 258, § 2, provides that "[t]he remedies provided by this chapter shall be exclusive of any other civil action or proceeding by reason of the same subject matter against . . . the public employee or his estate whose negligent or wrongful act or omission gave rise to such claim." Although, prior to the enactment of the Massachusetts Tort Claims Act, the misfeasance-nonfeasance distinction protected public employees from some types of negligence claims, see *Whitney* v. *Worcester,* 373 Mass. 208, 220 (1977), in many instances negligence victims were entitled to full tort recovery, a right not without substance given the prevailing practice of governmental entities of indemnifying officers and employees for their tort liability. *Id.* at 226.

no claims be paid until all claims from one incident are adjudicated. Instead, G. L. c. 258, § 3, permits claims to be brought "in the county where *the claimant* resides or in the county where [the] public employer is situated" (emphasis added), and contains no provision precluding payment of individual claims prior to the adjudication of all extant claims. Thus, pro rata distribution would have to be accomplished, if at all, on a makeshift basis nowhere detailed in the statutory scheme. Moreover, under a pro rata approach, settlement of claims without litigation (a major objective of the act) is defeated, and statutory provisions designed to promote settlement are rendered nugatory. The executive officer of a public employer "shall not arbitrate, compromise or settle any . . . claim before it has been presented to him in writing or after six months have passed from the date upon which such claim was presented to him." G. L. c. 258, § 5, inserted by St. 1978, c. 512, § 15. Under G. L. c. 258, § 4, claimants are permitted to file notices of claims within two years of the dates on which their causes of action accrue. The six-month settlement period created by § 5 may thus elapse before the claimants, or the public employer, knows the number of other claimants, let alone the relative worth of the various claims. This scenario creates no difficulties if the $100,000 maximum is applied on a "per plaintiff" or "per claim" basis but wreaks havoc with the settlement process under a "per incident" ceiling.[11] Either all claimants must apply immediately after the tort to ensure that each will be considered for a portion of the available settlement money, or more likely, settlement of claims will become, as practical matter, impossible.[12]

---

[11] Further, the Legislature did not provide a shortened statute of limitations for minors. Compare G. L. c. 231, § 60D (medical malpractice action). Thus, G. L. c. 260, § 7, operates to toll the period of limitations for claims brought on behalf of minors entitled to recovery under the Massachusetts Tort Claims Act. See G. L. c. 260, § 19. The "per incident" construction of the statute makes settlement of any claims by adults, arising from incidents of negligence in which one or more minors have been injured, difficult, if not impossible. A "per plaintiff" construction of the statute avoids this difficulty, among others.

[12] We note that some of these procedural problems also arise under standard indemnity insurance policies in applying the aggregate cap for policyholder

Having rejected the town's per-incident theory, we turn to the plaintiffs' "per claim" construction of the $100,000 liability limitation. We are not persuaded that the Legislature intended to allow a single plaintiff to recover up to $100,000 for each separate "claim" he or she brought against the public employer. There is no indication that the Legislature ever showed an awareness that a per-claim approach was a possible alternative construction of the liability limitation. Moreover, a per claim or per "count" liability limit would hinge total recovery on the resourcefulness of a plaintiff's counsel, leading to recoveries in excess of what the Legislature in all likelihood anticipated when it imposed the $100,000 limit.[13]

Finally, a "per claim" construction of the $100,000 limit would be inconsistent with the statutory usage of "claim" to denote all damages to one victim. See G. L. c. 258, § 7, inserted by St. 1978, c. 512, § 15, stating that "[t]he acceptance by the claimant of any . . . award, compromise or settlement [under G. L. c. 258] shall be final and conclusive on the claimant, and shall constitute a complete release of any claim

---

indemnity arising from a single incident. Such policies, however, typically do not allow one claimant to deplete totally the funds available for payment ·of claims. Rather, they contain a per person limit which is less than the aggregate indemnity cap. No such lower per claimant limit would exist under the statute if we were to adopt the town's per-incident construction. This difference between standard indemnity insurance policies and a per-incident construction of the $100,000 limit is significant. It makes the probable inequitable consequences resulting from the procedural complexity of allocating funds among claimants more severe under a per-incident reading of the statutory $100,000 liability cap than they are under standard insurance policy aggregate indemnity limits.

[13] The verdicts returned in this case illustrate the point. The action here concerns the deaths of Mark and Misty Jane Irwin, and personal injuries to Debbie and Steven Irwin. Thus there are four plaintiffs, including Debbie Irwin in her own right and in her several representative capacities. Maximun recovery under the per-plaintiff approach would be $400,000. There are ten counts asserted (e.g., Debbie Irwin for her personal injuries and for loss of consortium). Verdicts for the ten counts were in total amount of $873,697. On only one of the ten counts was there an award more than $100,000 ($455,000 for the count for the wrongful death of Mark Irwin). Using the per-claim approach, and applying the $100,000 cap to the Mark Irwin count, the maximum permissible recovery against the town would be in the total of $518,697.

against the public employer or against the public employee whose negligent or wrongful act or omission gave rise to such claim, and a complete bar to any action by the claimant against such public employer or public employee, by reason of the same subject matter."

Because the statute as a whole focuses on individual negligence claimants and demonstrates a legislative intent to be protective of the public funds, reflected in the exclusion of punitive damages and prejudgment interest, the $100,000 limit is properly construed as a cap on the damages recoverable by each victim of a public employee's negligence. We interpret the word "claim," as used in the statute, as referring to a demand for all damages arising from a tort to one person, not, as the plaintiffs argue, to each count of negligence. Cf. *Murdock Parlor Grate Co.* v. *Commonwealth,* 152 Mass. 28, 30 (1890). Construed as a "per claimant" or "per plaintiff" liability limit, the $100,000 cap ensures that a meaningful recovery will be available to victims of public employee negligence, while simultaneously limiting a public employer's exposure to excessive liability.

In arguing against the "per plaintiff" interpretation of the $100,000 limit, the parties direct our attention to earlier legislative proposals to abrogate municipal immunity which contained a per-plaintiff limitation on liability: see 1974 House Bill No. 2964 §§ 1-3; 1974 House Bill No. 5076 §§ 2-3; 1976 House Bill No. 1774 §§ 1-3; 1978 House Bill No. 1394 § 1. Of these, both parties focus on 1978 House Bill No. 1394, a bill proposed the year the current version of G. L. c. 258 (St. 1978, c. 512) was enacted. They observe that this bill contained a $250,000 per-plaintiff liability limitation which does not appear in St. 1978, c. 512. The town argues that the Legislature's failure to include a per-plaintiff limitation in St. 1978, c. 512, indicates, in light of § 6 *(b)* (5) of the proposed version in 1978 House Bill No. 1394, an intent to impose a per-incident limit on liability. In contrast, the plaintiffs follow the same reasoning to conclude that the Legislature intended the liability limitation in St. 1978, c. 512, to apply on a per-claim basis.

"The fallacy in [their arguments] is that no one knows why the legislature did not pass the proposed measures. . . . The practicalities of the legislative process furnish many reasons for the lack of success of a measure other than legislative dislike for the principle involved in the legislation." *Franklin v. Albert,* 381 Mass. 611, 615-616 (1980), quoting *Berry v. Branner,* 245 Or. 307, 311 (1966). "The disappearance of a provision during a legislative journey to enactment does not establish the contrary to be the law, especially when it appears on fair analysis of the final text that the provision would have amounted to surplusage." *Mercy Hosp.* v. *Rate Setting Comm'n,* 381 Mass. 34, 42 (1980). See *Miles* v. *Workers' Compensation Appeals Bd.,* 67 Cal. App. 3d 243, 248 n.4 (1977); *Ingleside* v. *Johnson,* 537 S.W.2d 145, 153 (Tex. Civ. App. 1976). The omission of the "per plaintiff" language in G. L. c. 258, § 2, may be attributable to any one or more of the spectrum of reasons. We are unwilling to accept a mode of statutory construction that permits twists and turns in the wording of unsuccessful bills to preclude this court from reading a portion of a statute in a manner consistent with its language, faithful to its intended purpose, and compatible with the remainder of the statute.

In sum, we conclude that a per-plaintiff construction of the $100,000 limitation on public employer liability contained in G. L. c. 258, § 2, best serves the Legislature's intent as evidenced by the language and purposes of the statute.[14]

---

[14] We are supported in our view by the facts that where other jurisdictions in their tort claims acts have set monetary limits as low as $100,000, they have widely applied such on a "per-plaintiff" basis, and that "per-incident" limits in a great majority of other jurisdictions are substantially higher than $100,000. See, e.g., Ala. Code § 11-93-2 (Supp. 1983) (personal injury limits of $100,000 per claimant, $300,000 per incident); Colo. Rev. Stat. § 24-10-114 (1982) ($150,000 per claimant, $400,000 per incident); Del. Code Ann. tit. 10, § 4013 (Supp. 1982) ($300,000 per incident); Fla. Stat. Ann. § 768.28 (West Supp. 1984) ($100,000 per claimant, $200,000 per incident); Idaho Code § 6-926 (b) (1979 & Supp. 1984) ($100,000 per claimant, $300,000 per incident; increased to $500,000 per incident effective Oct. 1, 1984); Ind. Code Ann. § 34-4-16.5-4 (Burns Supp. 1984) ($300,000 per claimant, $5,000,000 per incident); Kan. Stat. Ann. § 75-6105 (Supp.

6. *Other Issues.*

The town contends that the testimony of the eyewitness that in her opinion Fuller was intoxicated is inadmissible. We disagree. A lay person's testimony that another was intoxicated is admissible in evidence. See *Holton* v. *Boston Elev. Ry.,* 303 Mass. 242, 246 (1939); *Edwards* v. *Worcester,* 172 Mass. 104, 105 (1898).

The remaining arguments of the town allege error regarding matters fairly within the scope of the trial judge's sound discretion to decide. We find no abuse of discretion in any of the challenged rulings.

7. *Conclusion.*

In sum, we conclude that, under G. L. c. 258, a town or city may be held liable in damages for the negligent failure of its police officers to remove from the highway a motor vehicle operator who is under the influence of intoxicating liquor and who subsequently causes injuries or death to other travellers. However, the damages are limited under the statute to $100,000 for each plaintiff, even for a plaintiff who has more than one "claim." In the circumstances shown here, it was appropriate

---

1983) ($500,000 per incident); Me. Rev. Stat. Ann. tit. 14, § 8105 (1980) ($300,0000 per incident); Md. Cts. & Jud. Proc. Code Ann. § 5-403 (1984) ($100,000 per claimant, $500,000 per incident); Minn. Stat. Ann. § 466.04 (West 1977 & Supp. 1984) ($100,000 per claimant, $300,000 per incident; increased to $200,000 per claimant, $600,000 per incident, effective Aug. 1, 1984); Mo. Ann. Stat. § 537.610 (Vernon Supp. 1984) ($100,000 per claimant, $800,000 per incident); N.H. Rev. Stat. Ann. § 507-B:4 (1983) ($100,000 per claimant); N.C. Gen. Stat. § 143-291 (1983) ($100,000 per claimant); N.D. Cent. Code § 32-12.1-03 (Supp. 1983) ($250,000 per claimant, $500,000 per incident); Okla. Stat. Ann. tit. 51, § 154 (West Supp. 1983) ($100,000 per claimant, $1,000,000 per incident); Or. Rev. Stat. § 30.270 (1983) ($100,000 per claimant, $300,000 per incident); 42 Pa. Cons. Stat. Ann. § 8553 (Purdon 1982) ($500,000 per incident); Tex. Rev. Civ. Stat. Ann. § 6252-19 (Vernon Supp. 1984) (State government liability of $250,000 per claimant, $500,000 per incident; local government liability of $100,000 per claimant, $300,000 per incident); Utah Code Ann. § 63-30-34 (Supp. 1983) ($250,000 per claimant, $500,000 per incident); Vt. Stat. Ann. tit. 12, § 5601 (1973) ($75,000 per claimant, $300,000 per incident). But see R.I. Gen. Laws § 9-31-2 (Supp. 1983). Compare other jurisdictions with relatively low liability limits, applicable, however, on a per-claimant basis: Va. Code § 80-1-195.3 (Supp. 1983) ($25,000 per claimant); Wis. Stat. Ann. § 893.80 (West 1983) ($50,000 per claimant).

for the judge to submit the plaintiffs' case to the jury because the evidence, viewed in the light most favorable to the plaintiffs, warranted verdicts for the plaintiffs. However, because the letter concerning blood alcohol content was erroneously admitted, there must be a new trial. Accordingly, the judgments for the plaintiffs are reversed, and the case remanded to the Superior Court for a new trial to be conducted in a manner consistent with this opinion.

*So ordered.*

NOLAN, J. (dissenting, with whom Lynch and O'Connor, JJ., join). I dissent from part 3 of the court's opinion. The court's reasoning concerning the police officer's duty clearly flies in the face of our decision in *Dinsky* v. *Framingham,* 386 Mass. 801 (1982).

In *Dinsky, supra* at 810, this court declined to depart from the "public duty" rule which provides that in the absence of a special duty owed to specific plaintiffs, "different from that owed to the general public at large," no cause of action for negligence against a town or town officials can be maintained.

The rule in a majority of jurisdictions in public service cases requires the presence of two factors before an actionable special duty of the police is found. "First, there must be some form of privity between the police department and the victim that sets the victim apart from the general public. . . . Second, there must be specific assurances of protection that give rise to justifiable reliance by the victim." *Warren* v. *District of Columbia,* 444 A.2d 1, 10 (D.C. Ct. App. 1981) (Kelly, J., concurring in part and dissenting in part). See *Jackson* v. *Clements,* 146 Cal. App. 3d 983, 987-989 (1983) (no special duty arose when police officers failed to prevent intoxicated minors from driving); *Shore* v. *Stonington,* 187 Conn. 147 (1982) (failure to arrest after stopping the drunken operator did not subject identifiable victim to imminent harm); *Crouch* v. *Hall,*   Ind. App.   ,   -   (1980) (406 N.E.2d 303, 304-305 [Ind. App. 1980]) (no special duty owed to rape victim for negligent inves-

tigation of earlier rape); *Fusilier* v. *Russell,* 345 So. 2d 543, 546 (La. App. Ct. 1977) (police officer's failure to arrest intoxicated individual did not give rise to a special duty to motorist); *Evers* v. *Westerberg,* 38 A.D.2d 751 (1972), aff'd, 32 N.Y.2d 684 (1973) (failure to arrest intoxicated driver did not give rise to a special duty).

In the present case, the court departs from this majority position and imposes a duty on police officers in the absence of an identifiable victim. The police had no privity with the plaintiffs in this case and gave no specific assurances of protection. The plaintiffs have not demonstrated the requisite special relationship which creates the duty (and duty is still an element of the tort of negligence).

Moreover, some of the very cases which the court cites as authority support the traditional rule of public duty. For instance in *DeLong* v. *County of Erie,* 60 N.Y.2d 296, 301 (1983), a specific individual initiated the 911 emergency call, received specific assurances of protection and relied on the assurances. And there are other cases. See *Lorshbough* v. *Buzzle,* 258 N.W.2d 96, 102 (Minn. 1977) (known risk of fire to surrounding identifiable landowners). Cf. *Taplin* v. *Chatham,* 390 Mass. 1, 2-5 (1983) (emergency medical technicians negligently failed to bring identifiable victim to a hospital); *Slaven* v. *Salem,* 386 Mass. 885, 887 (1982) (duty owed by prison officials to a person within their custody and control); *Prigden* v. *Boston Hous. Auth.,* 364 Mass. 696, 709 (1974) (landowner owes a duty of reasonable care to avoid injury to trespasser whose trapped position is known).

The court's reliance on those decisions addressing the duty of liquor store owners to the general public is entirely off the mark. *Supra* at 757-760. The public duty rule is simply not applicable in the private sector and the cases cited cannot serve as analogues.

The court has essentially abandoned the public duty rule and has imposed a new "common law duty" upon police officers while still using the rubric of the public duty rule. The court extends the duty to all possible plaintiffs, thereby discarding the requisite (and reasonable) finding of a special relationship.

If the court thought it wise to follow this path, I suggest that it should have summoned the courage to abolish explicitly the generally accepted rule in public service cases. See *Ryan* v. *Arizona,* 134 Ariz. 308, 310-311 (1982). The course of action taken by the court today is regrettable. Its effect on tomorrow is frightening.

My dissent from part 3 makes it unnecessary to reach part 5. If I were to reach part 5, I would agree with the court.